## NATIONAL TREASURY EMPLOYEES UNION ET AL. *v.* VON RAAB, COMMISSIONER, UNITED STATES CUSTOMS SERVICE

No. 86–1879.   Argued November 2, 1988—Decided March 21, 1989

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 679. SCALIA, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 680.

*Lois G. Williams* argued the cause for petitioners. With her on the briefs was *Elaine D. Kaplan.*

*Solicitor General Fried* argued the cause for respondent. With him on the brief were *Assistant Attorney General Bolton, Deputy Solicitor General Merrill, Deputy Assistant Attorneys General Spears* and *Cynkar, Lawrence S. Rob-*

*bins, Leonard Schaitman, Robert V. Zener,* and *James H. Anderson.**

JUSTICE KENNEDY delivered the opinion of the Court.

We granted certiorari to decide whether it violates the Fourth Amendment for the United States Customs Service to require a urinalysis test from employees who seek transfer or promotion to certain positions.

## I

### A

The United States Customs Service, a bureau of the Department of the Treasury, is the federal agency responsible for processing persons, carriers, cargo, and mail into the United States, collecting revenue from imports, and enforcing customs and related laws. See United States Customs Service, Customs U. S. A., Fiscal Year 1985, p. 4. An important responsibility of the Service is the interdiction and

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Stephen H. Sachs, Carl Willner, John A. Powell, Steven R. Shapiro, Arthur B. Spitzer,* and *Elizabeth Symonds;* for the American Federation of Labor and Congress of Industrial Organizations et al. by *Joe Goldberg, David Silberman, Laurence Gold, Edward J. Hickey, Jr., Thomas A. Woodley,* and *Richard Kirschner;* for the Coalition of California Utility Workers by *Glenn Rothner;* for the Fraternal Order of Police, Grand Lodge, by *James E. Phillips* and *John R. Fisher;* and for the New Jersey State Lodge, Fraternal Order of Police, by *Jay Rubenstein, Janemary S. Belsole,* and *Stuart Reiser.*

Briefs of *amici curiae* urging affirmance were filed for the California Employment Law Council by *Paul Grossman;* for the College of American Pathologists by *Jack R. Bierig;* for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell, Stephen C. Yohay,* and *Garen E. Dodge;* for Pharmchem Laboratories, Inc., et al. by *Nelson G. Dong;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo, Paul D. Kamenar,* and *Vicki S. Marani.*

Briefs of *amici curiae* were filed for the Chamber of Commerce of the United States of America by *Paul R. Friedman* and *Stephen A. Bokat;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Anthony T. Caso.*

seizure of contraband, including illegal drugs. *Ibid.* In 1987 alone, Customs agents seized drugs with a retail value of nearly $9 billion. See United States Customs Service, Customs U. S. A., Fiscal Year 1987, p. 40. In the routine discharge of their duties, many Customs employees have direct contact with those who traffic in drugs for profit. Drug import operations, often directed by sophisticated criminal syndicates, *United States* v. *Mendenhall,* 446 U. S. 544, 561–562 (1980) (Powell, J., concurring), may be effected by violence or its threat. As a necessary response, many Customs operatives carry and use firearms in connection with their official duties. App. 109.

In December 1985, respondent, the Commissioner of Customs, established a Drug Screening Task Force to explore the possibility of implementing a drug-screening program within the Service. *Id.,* at 11. After extensive research and consultation with experts in the field, the task force concluded that "drug screening through urinalysis is technologically reliable, valid and accurate." *Ibid.* Citing this conclusion, the Commissioner announced his intention to require drug tests of employees who applied for, or occupied, certain positions within the Service. *Id.,* at 10–11. The Commissioner stated his belief that "Customs is largely drug-free," but noted also that "unfortunately no segment of society is immune from the threat of illegal drug use." *Id.,* at 10. Drug interdiction has become the agency's primary enforcement mission, and the Commissioner stressed that "there is no room in the Customs Service for those who break the laws prohibiting the possession and use of illegal drugs." *Ibid.*

In May 1986, the Commissioner announced implementation of the drug-testing program. Drug tests were made a condition of placement or employment for positions that meet one or more of three criteria. The first is direct involvement in drug interdiction or enforcement of related laws, an activity the Commissioner deemed fraught with obvious dangers to the mission of the agency and the lives of Customs

agents. *Id.*, at 17, 113. The second criterion is a require-
ment that the incumbent carry firearms, as the Commis-
sioner concluded that "[p]ublic safety demands that employ-
ees who carry deadly arms and are prepared to make instant
life or death decisions be drug free." *Id.*, at 113. The third
criterion is a requirement for the incumbent to handle "classi-
fied" material, which the Commissioner determined might
fall into the hands of smugglers if accessible to employees
who, by reason of their own illegal drug use, are susceptible
to bribery or blackmail. *Id.*, at 114.

After an employee qualifies for a position covered by the
Customs testing program, the Service advises him by letter
that his final selection is contingent upon successful com-
pletion of drug screening. An independent contractor con-
tacts the employee to fix the time and place for collecting the
sample. On reporting for the test, the employee must pro-
duce photographic identification and remove any outer gar-
ments, such as a coat or a jacket, and personal belongings.
The employee may produce the sample behind a partition, or
in the privacy of a bathroom stall if he so chooses. To ensure
against adulteration of the specimen, or substitution of a
sample from another person, a monitor of the same sex as the
employee remains close at hand to listen for the normal
sounds of urination. Dye is added to the toilet water to pre-
vent the employee from using the water to adulterate the
sample.

Upon receiving the specimen, the monitor inspects it to en-
sure its proper temperature and color, places a tamper-proof
custody seal over the container, and affixes an identification
label indicating the date and the individual's specimen num-
ber. The employee signs a chain-of-custody form, which is
initialed by the monitor, and the urine sample is placed in a
plastic bag, sealed, and submitted to a laboratory.[1]

---

[1] After this case was decided by the Court of Appeals, 816 F. 2d 170
(CA5 1987), the United States Department of Health and Human Services,
in accordance with recently enacted legislation, Pub. L. 100–71, § 503, 101

The laboratory tests the sample for the presence of marijuana, cocaine, opiates, amphetamines, and phencyclidine. Two tests are used. An initial screening test uses the enzyme-multiplied-immunoassay technique (EMIT). Any specimen that is identified as positive on this initial test must then be confirmed using gas chromatography/mass spectrometry (GC/MS). Confirmed positive results are reported to a "Medical Review Officer," "[a] licensed physician . . . who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate an individual's positive test result together with his or her medical history and any other relevant biomedical information." HHS Reg. § 1.2,

Stat. 468–471, promulgated regulations (hereinafter HHS Regulations or HHS Reg.) governing certain federal employee drug-testing programs. 53 Fed. Reg. 11979 (1988). To the extent the HHS Regulations add to, or depart from, the procedures adopted as part of a federal drug-screening program covered by Pub. L. 100–71, the HHS Regulations control. Pub. L. 100–71, § 503(b)(2)(B), 101 Stat. 470. Both parties agree that the Customs Service's drug-testing program must conform to the HHS Regulations. See Brief for Petitioners 6, n. 8; Brief for Respondent 4–5, and n. 4. We therefore consider the HHS Regulations to the extent they supplement or displace the Commissioner's original directive. See *California Bankers Assn.* v. *Shultz*, 416 U. S. 21, 53 (1974); *Thorpe* v. *Housing Authority of Durham*, 393 U. S. 268, 281–282 (1969).

One respect in which the original Customs directive differs from the now-prevailing regime concerns the extent to which the employee may be required to disclose personal medical information. Under the Service's original plan, each tested employee was asked to disclose, at the time the urine sample was collected, any medications taken within the last 30 days, and to explain any circumstances under which he may have been in legitimate contact with illegal substances within the last 30 days. Failure to provide this information at this time could result in the agency not considering the effect of medications or other licit contacts with drugs on a positive test result. Under the HHS Regulations, an employee need not provide information concerning medications when he produces the sample for testing. He may instead present such information only after he is notified that his specimen tested positive for illicit drugs, at which time the Medical Review Officer reviews all records made available by the employee to determine whether the positive indication could have been caused by lawful use of drugs. See HHS Reg. § 2.7, 53 Fed. Reg. 11985–11986 (1988).

53 Fed. Reg. 11980 (1988); HHS Reg. § 2.4(g), 53 Fed. Reg., at 11983. After verifying the positive result, the Medical Review Officer transmits it to the agency.

Customs employees who test positive for drugs and who can offer no satisfactory explanation are subject to dismissal from the Service. Test results may not, however, be turned over to any other agency, including criminal prosecutors, without the employee's written consent.

## B

Petitioners, a union of federal employees and a union official, commenced this suit in the United States District Court for the Eastern District of Louisiana on behalf of current Customs Service employees who seek covered positions. Petitioners alleged that the Custom Service drug-testing program violated, *inter alia*, the Fourth Amendment. The District Court agreed. 649 F. Supp. 380 (1986). The court acknowledged "the legitimate governmental interest in a drug-free work place and work force," but concluded that "the drug testing plan constitutes an overly intrusive policy of searches and seizures without probable cause or reasonable suspicion, in violation of legitimate expectations of privacy." *Id.*, at 387. The court enjoined the drug-testing program, and ordered the Customs Service not to require drug tests of any applicants for covered positions.

A divided panel of the United States Court of Appeals for the Fifth Circuit vacated the injunction. 816 F. 2d 170 (1987). The court agreed with petitioners that the drug-screening program, by requiring an employee to produce a urine sample for chemical testing, effects a search within the meaning of the Fourth Amendment. The court held further that the searches required by the Commissioner's directive are reasonable under the Fourth Amendment. It first noted that "[t]he Service has attempted to minimize the intrusiveness of the search" by not requiring visual observation of the act of urination and by affording notice to the employee that

he will be tested. *Id.*, at 177. The court also considered it significant that the program limits discretion in determining which employees are to be tested, *ibid.*, and noted that the tests are an aspect of the employment relationship, *id.*, at 178.

The court further found that the Government has a strong interest in detecting drug use among employees who meet the criteria of the Customs program. It reasoned that drug use by covered employees casts substantial doubt on their ability to discharge their duties honestly and vigorously, undermining public confidence in the integrity of the Service and concomitantly impairing the Service's efforts to enforce the drug laws. *Ibid.* Illicit drug users, the court found, are susceptible to bribery and blackmail, may be tempted to divert for their own use portions of any drug shipments they interdict, and may, if required to carry firearms, "endanger the safety of their fellow agents, as well as their own, when their performance is impaired by drug use." *Ibid.* "Considering the nature and responsibilities of the jobs for which applicants are being considered at Customs and the limited scope of the search," the court stated, "the exaction of consent as a condition of assignment to the new job is not unreasonable." *Id.*, at 179.

The dissenting judge concluded that the Customs program is not an effective method for achieving the Service's goals. He argued principally that an employee "given a five day notification of a test date need only abstain from drug use to prevent being identified as a user." *Id.*, at 184. He noted also that persons already employed in sensitive positions are not subject to the test. *Ibid.* Because he did not believe the Customs program can achieve its purposes, the dissenting judge found it unreasonable under the Fourth Amendment.

We granted certiorari. 485 U. S. 903 (1988). We now affirm so much of the judgment of the Court of Appeals as upheld the testing of employees directly involved in drug interdiction or required to carry firearms. We vacate the

judgment to the extent it upheld the testing of applicants for positions requiring the incumbent to handle classified materials, and remand for further proceedings.

## II

In *Skinner* v. *Railway Labor Executives' Assn.*, *ante*, at 616–618, decided today, we held that federal regulations requiring employees of private railroads to produce urine samples for chemical testing implicate the Fourth Amendment, as those tests invade reasonable expectations of privacy. Our earlier cases have settled that the Fourth Amendment protects individuals from unreasonable searches conducted by the Government, even when the Government acts as an employer, *O'Connor* v. *Ortega*, 480 U. S. 709, 717 (1987) (plurality opinion); see *id.*, at 731 (SCALIA, J., concurring in judgment), and, in view of our holding in *Railway Labor Executives* that urine tests are searches, it follows that the Customs Service's drug-testing program must meet the reasonableness requirement of the Fourth Amendment.

While we have often emphasized, and reiterate today, that a search must be supported, as a general matter, by a warrant issued upon probable cause, see, *e. g.*, *Griffin* v. *Wisconsin*, 483 U. S. 868, 873 (1987); *United States* v. *Karo*, 468 U. S. 705, 717 (1984), our decision in *Railway Labor Executives* reaffirms the longstanding principle that neither a *warrant nor probable cause, nor, indeed, any measure of individualized suspicion*, is an indispensable component of reasonableness in every circumstance. *Ante*, at 618–624. See also *New Jersey* v. *T. L. O.*, 469 U. S. 325, 342, n. 8 (1985); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 556–661 (1976). As we note in *Railway Labor Executives*, our cases establish that where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or

some level of individualized suspicion in the particular context. *Ante,* at 619–620.

It is clear that the Customs Service's drug-testing program is not designed to serve the ordinary needs of law enforcement. Test results may not be used in a criminal prosecution of the employee without the employee's consent. The purposes of the program are to deter drug use among those eligible for promotion to sensitive positions within the Service and to prevent the promotion of drug users to those positions. These substantial interests, no less than the Government's concern for safe rail transportation at issue in *Railway Labor Executives,* present a special need that may justify departure from the ordinary warrant and probable-cause requirements.

A

Petitioners do not contend that a warrant is required by the balance of privacy and governmental interests in this context, nor could any such contention withstand scrutiny. We have recognized before that requiring the Government to procure a warrant for every work-related intrusion "would conflict with 'the common-sense realization that government offices could not function if every employment decision became a constitutional matter.'" *O'Connor* v. *Ortega, supra,* at 722, quoting *Connick* v. *Myers,* 461 U. S. 138, 143 (1983). See also 480 U. S., at 732 (SCALIA, J., concurring in judgment); *New Jersey* v. *T. L. O., supra,* at 340 (noting that "[t]he warrant requirement . . . is unsuited to the school environment: requiring a teacher to obtain a warrant before searching a child suspected of an infraction of school rules (or of the criminal law) would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools"). Even if Customs Service employees are more likely to be familiar with the procedures required to obtain a warrant than most other Government workers, requiring a warrant in this context would serve only to divert valuable agency resources from the Service's primary mis-

sion. The Customs Service has been entrusted with pressing responsibilities, and its mission would be compromised if it were required to seek search warrants in connection with routine, yet sensitive, employment decisions.

Furthermore, a warrant would provide little or nothing in the way of additional protection of personal privacy. A warrant serves primarily to advise the citizen that an intrusion is authorized by law and limited in its permissible scope and to interpose a neutral magistrate between the citizen and the law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States*, 333 U. S. 10, 14 (1948). But in the present context, "the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically . . . , and doubtless are well known to covered employees." *Ante*, at 622. Under the Customs program, every employee who seeks a transfer to a covered position knows that he must take a drug test, and is likewise aware of the procedures the Service must follow in administering the test. A covered employee is simply not subject "to the discretion of the official in the field." *Camara* v. *Municipal Court of San Francisco*, 387 U. S. 523, 532 (1967). The process becomes automatic when the employee elects to apply for, and thereafter pursue, a covered position. Because the Service does not make a discretionary determination to search based on a judgment that certain conditions are present, there are simply "no special facts for a neutral magistrate to evaluate." *South Dakota* v. *Opperman*, 428 U. S. 364, 383 (1976) (Powell, J., concurring).

B

Even where it is reasonable to dispense with the warrant requirement in the particular circumstances, a search ordinarily must be based on probable cause. *Ante*, at 624. Our cases teach, however, that the probable-cause standard "'is peculiarly related to criminal investigations.'" *Colorado* v. *Bertine*, 479 U. S. 367, 371 (1987), quoting *South Dakota* v.

*Opperman, supra,* at 370, n. 5. In particular, the traditional probable-cause standard may be unhelpful in analyzing the reasonableness of routine administrative functions, *Colorado* v. *Bertine, supra,* at 371; see also *O'Connor* v. *Ortega,* 480 U. S., at 723, especially where the Government seeks to *prevent* the development of hazardous conditions or to detect violations that rarely generate articulable grounds for searching any particular place or person. Cf. *Camara* v. *Municipal Court of San Francisco, supra,* at 535–536 (noting that building code inspections, unlike searches conducted pursuant to a criminal investigation, are designed "to prevent even the unintentional development of conditions which are hazardous to public health and safety"); *United States* v. *Martinez-Fuerte,* 428 U. S., at 557 (noting that requiring particularized suspicion before routine stops on major highways near the Mexican border "would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens"). Our precedents have settled that, in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion. *E. g., ante,* at 624. We think the Government's need to conduct the suspicionless searches required by the Customs program outweighs the privacy interests of employees engaged directly in drug interdiction, and of those who otherwise are required to carry firearms.

The Customs Service is our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population. We have adverted before to "the veritable national crisis in law enforcement caused by smuggling of illicit narcotics." *United States* v. *Montoya de Hernandez,* 473 U. S. 531, 538 (1985). See also *Florida* v. *Royer,* 460 U. S. 491, 513 (BLACKMUN, J., dissenting). Our

cases also reflect the traffickers' seemingly inexhaustible repertoire of deceptive practices and elaborate schemes for importing narcotics, *e. g., United States* v. *Montoya de Hernandez, supra,* at 538–539; *United States* v. *Ramsey,* 431 U. S. 606, 608–609 (1977). The record in this case confirms that, through the adroit selection of source locations, smuggling routes, and increasingly elaborate methods of concealment, drug traffickers have managed to bring into this country increasingly large quantities of illegal drugs. App. 111. The record also indicates, and it is well known, that drug smugglers do not hesitate to use violence to protect their lucrative trade and avoid apprehension. *Id.,* at 109.

Many of the Service's employees are often exposed to this criminal element and to the controlled substances it seeks to smuggle into the country. *Ibid.* Cf. *United States* v. *Montoya de Hernandez, supra,* at 543. The physical safety of these employees may be threatened, and many may be tempted not only by bribes from the traffickers with whom they deal, but also by their own access to vast sources of valuable contraband seized and controlled by the Service. The Commissioner indicated below that "Customs [o]fficers have been shot, stabbed, run over, dragged by automobiles, and assaulted with blunt objects while performing their duties." App. at 109–110. At least nine officers have died in the line of duty since 1974. He also noted that Customs officers have been the targets of bribery by drug smugglers on numerous occasions, and several have been removed from the Service for accepting bribes and for other integrity violations. *Id.,* at 114. See also United States Customs Service, Customs U. S. A., Fiscal Year 1987, p. 31 (reporting internal investigations that resulted in the arrest of 24 employees and 54 civilians); United States Customs Service, Customs U. S. A., Fiscal Year 1986, p. 32 (reporting that 334 criminal and serious integrity investigations were conducted during the fiscal year, resulting in the arrest of 37 employees and 17 civilians); United States Customs Service, Customs

U. S. A., Fiscal Year 1985, p. 32 (reporting that 284 criminal and serious integrity investigations were conducted during the 1985 fiscal year, resulting in the arrest of 15 employees and 51 civilians).

It is readily apparent that the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment. Indeed, the Government's interest here is at least as important as its interest in searching travelers entering the country. We have long held that travelers seeking to enter the country may be stopped and required to submit to a routine search without probable cause, or even founded suspicion, "because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Carroll* v. *United States*, 267 U. S. 132, 154 (1925). See also *United States* v. *Montoya de Hernandez*, *supra*, at 538; *United States* v. *Ramsey*, *supra*, at 617–619. This national interest in self-protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics. A drug user's indifference to the Service's basic mission or, even worse, his active complicity with the malefactors, can facilitate importation of sizable drug shipments or block apprehension of dangerous criminals. The public interest demands effective measures to bar drug users from positions directly involving the interdiction of illegal drugs.

The public interest likewise demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm, even if the incumbent is not engaged directly in the interdiction of drugs. Customs employees who may use deadly force plainly "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Ante*, at 628. We agree with the Government

that the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force. Indeed, ensuring against the creation of this dangerous risk will itself further Fourth Amendment values, as the use of deadly force may violate the Fourth Amendment in certain circumstances. See *Tennessee* v. *Garner*, 471 U. S. 1, 7–12 (1985).

Against these valid public interests we must weigh the interference with individual liberty that results from requiring these classes of employees to undergo a urine test. The interference with individual privacy that results from the collection of a urine sample for subsequent chemical analysis could be substantial in some circumstances. *Ante*, at 626. We have recognized, however, that the "operational realities of the workplace" may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts. See *O'Connor* v. *Ortega*, 480 U. S., at 717; *id.*, at 732 (SCALIA, J., concurring in judgment). While these operational realities will rarely affect an employee's expectations of privacy with respect to searches of his person, or of personal effects that the employee may bring to the workplace, *id.*, at 716, 725, it is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches. Employees of the United States Mint, for example, should expect to be subject to certain routine personal searches when they leave the workplace every day. Similarly, those who join our military or intelligence services may not only be required to give what in other contexts might be viewed as extraordinary assurances of trustworthiness and probity, but also may expect intrusive inquiries into their physical fitness for those special positions. Cf. *Snepp* v. *United States*, 444 U. S. 507, 509, n. 3 (1980); *Parker* v. *Levy*, 417 U. S. 733, 758 (1974); *Committee for GI Rights* v.

*Callaway*, 171 U. S. App. D. C. 73, 84, 518 F. 2d 466, 477 (1975).

We think Customs employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test. Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity. Much the same is true of employees who are required to carry firearms. Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness. Cf. *In re Caruso* v. *Ward*, 72 N. Y. 2d 433, 441, 530 N. E. 2d 850, 854–855 (1988). While reasonable tests designed to elicit this information doubtless infringe some privacy expectations, we do not believe these expectations outweigh the Government's compelling interests in safety and in the integrity of our borders.[2]

---

[2] The procedures prescribed by the Customs Service for the collection and analysis of the requisite samples do not carry the grave potential for "arbitrary and oppressive interference with the privacy and personal security of individuals," *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 554, (1976), that the Fourth Amendment was designed to prevent. Indeed, these procedures significantly minimize the program's intrusion on privacy interests. Only employees who have been tentatively accepted for promotion or transfer to one of the three categories of covered positions are tested, and applicants know at the outset that a drug test is a requirement of those positions. Employees are also notified in advance of the scheduled sample collection, thus reducing to a minimum any "unsettling show of authority," *Delaware* v. *Prouse*, 440 U. S. 648, 657 (1979), that may be associated with unexpected intrusions on privacy. Cf. *United States* v. *Martinez-Fuerte, supra*, at 559 (noting that the intrusion on privacy occasioned by routine highway checkpoints is minimized by the fact that motorists "are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere"); *Wyman* v. *James*, 400 U. S. 309, 320–321 (1971) (providing a welfare re-

Without disparaging the importance of the governmental interests that support the suspicionless searches of these employees, petitioners nevertheless contend that the Service's drug-testing program is unreasonable in two particulars. First, petitioners argue that the program is unjustified because it is not based on a belief that testing will reveal any drug use by covered employees. In pressing this argument, petitioners point out that the Service's testing scheme was not implemented in response to any perceived drug problem among Customs employees, and that the program actually has not led to the discovery of a significant number of drug users. Brief for Petitioners 37, 44; Tr. of Oral Arg. 11–12, 20–21. Counsel for petitioners informed us at oral argument that no more than 5 employees out of 3,600 have tested positive for drugs. *Id.*, at 11. Second, petitioners contend that the Service's scheme is not a "sufficiently productive mechanism to justify [its] intrusion upon Fourth Amendment interests," *Delaware* v. *Prouse,* 440 U. S. 648, 658–659 (1979), because illegal drug users can avoid detection with ease by temporary abstinence or by surreptitious adulteration of their urine specimens. Brief for Petitioners 46–47. These contentions are unpersuasive.

---

cipient with advance notice that she would be visited by a welfare caseworker minimized the intrusion on privacy occasioned by the visit). There is no direct observation of the act of urination, as the employee may provide a specimen in the privacy of a stall.

Further, urine samples may be examined only for the specified drugs. The use of samples to test for any other substances is prohibited. See HHS Reg. § 2.1(c), 53 Fed. Reg. 11980 (1988). And, as the Court of Appeals noted, the combination of EMIT and GC/MS tests required by the Service is highly accurate, assuming proper storage, handling, and measurement techniques. 816 F. 2d, at 181. Finally, an employee need not disclose personal medical information to the Government unless his test result is positive, and even then any such information is reported to a licensed physician. Taken together, these procedures significantly minimize the intrusiveness of the Service's drug-screening program.

Petitioners' first contention evinces an unduly narrow view of the context in which the Service's testing program was implemented. Petitioners do not dispute, nor can there be doubt, that drug abuse is one of the most serious problems confronting our society today. There is little reason to believe that American workplaces are immune from this pervasive social problem, as is amply illustrated by our decision in *Railway Labor Executives*. See also *Masino* v. *United States*, 589 F. 2d 1048, 1050 (Ct. Cl. 1978) (describing marijuana use by two Customs inspectors). Detecting drug impairment on the part of employees can be a difficult task, especially where, as here, it is not feasible to subject employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments. Indeed, the almost unique mission of the Service gives the Government a compelling interest in ensuring that many of these covered employees do not use drugs even off duty, for such use creates risks of bribery and blackmail against which the Government is entitled to guard. In light of the extraordinary safety and national security hazards that would attend the promotion of drug users to positions that require the carrying of firearms or the interdiction of controlled substances, the Service's policy of deterring drug users from seeking such promotions cannot be deemed unreasonable.

The mere circumstance that all but a few of the employees tested are entirely innocent of wrongdoing does not impugn the program's validity. The same is likely to be true of householders who are required to submit to suspicionless housing code inspections, see *Camara* v. *Municipal Court of San Francisco*, 387 U. S. 523 (1967), and of motorists who are stopped at the checkpoints we approved in *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976). The Service's program is designed to prevent the promotion of drug users to sensitive positions as much as it is designed to detect those employees who use drugs. Where, as here, the possible harm against which the Government seeks to guard is

substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal.[3]

---

[3] The point is well illustrated also by the Federal Government's practice of requiring the search of all passengers seeking to board commercial airliners, as well as the search of their carry-on luggage, without any basis for suspecting any particular passenger of an untoward motive. Applying our precedents dealing with administrative searches, see, *e. g., Camara* v. *Municipal Court of San Francisco*, 387 U. S. 523 (1967), the lower courts that have considered the question have consistently concluded that such searches are reasonable under the Fourth Amendment. As Judge Friendly explained in a leading case upholding such searches:

"When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, that danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air." *United States* v. *Edwards*, 498 F. 2d 496, 500 (CA2 1974) (emphasis in original).

See also *United States* v. *Skipwith*, 482 F. 2d 1272, 1275–1276 (CA5 1973); *United States* v. *Davis*, 482 F. 2d 893, 907–912 (CA9 1973). It is true, as counsel for petitioners pointed out at oral argument, that these air piracy precautions were adopted in response to an observable national and international hijacking crisis. Tr. of Oral Arg. 13. Yet we would not suppose that, if the validity of these searches be conceded, the Government would be precluded from conducting them absent a demonstration of danger as to any particular airport or airline. It is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem from spreading to the particular context.

Nor would we think, in view of the obvious deterrent purpose of these searches, that the validity of the Government's airport screening program necessarily turns on whether significant numbers of putative air pirates are actually discovered by the searches conducted under the program. In the 15 years the program has been in effect, more than 9.5 *billion* persons have been screened, and over 10 *billion* pieces of luggage have been inspected. See Federal Aviation Administration, Semiannual Report to Congress on the Effectiveness of The Civil Aviation Program (Nov. 1988) (Exhibit 6). By far the overwhelming majority of those persons who have been searched, like Customs employees who have been tested under the Service's drug-screening scheme, have proved entirely innocent—only

We think petitioners' second argument—that the Service's testing program is ineffective because employees may attempt to deceive the test by a brief abstention before the test date, or by adulterating their urine specimens—overstates the case. As the Court of Appeals noted, addicts may be unable to abstain even for a limited period of time, or may be unaware of the "fade-away effect" of certain drugs. 816 F. 2d, at 180. More importantly, the avoidance techniques suggested by petitioners are fraught with uncertainty and risks for those employees who venture to attempt them. A particular employee's pattern of elimination for a given drug cannot be predicted with perfect accuracy, and, in any event, this information is not likely to be known or available to the employee. Petitioners' own expert indicated below that the time it takes for particular drugs to become undetectable in urine can vary widely depending on the individual, and may extend for as long as 22 days. App. 66. See also *ante*, at 631 (noting Court of Appeals' reliance on certain academic literature that indicates that the testing of urine can discover drug use " 'for . . . weeks after the ingestion of the drug' "). Thus, contrary to petitioners' suggestion, no employee reasonably can expect to deceive the test by the simple expedient of abstaining after the test date is assigned. Nor can he expect attempts at adulteration to succeed, in view of the precautions taken by the sample collector to ensure the integrity of the sample. In all the circumstances, we are persuaded that the program bears a close and substantial relation to the Service's goal of deterring drug users from seeking promotion to sensitive positions.[4]

42,000 firearms have been detected during the same period. *Ibid.* When the Government's interest lies in deterring highly hazardous conduct, a low incidence of such conduct, far from impugning the validity of the scheme for implementing this interest, is more logically viewed as a hallmark of success. See *Bell* v. *Wolfish,* 441 U. S. 520, 559 (1979).

[4] Indeed, petitioners' objection is based on those features of the Service's program—the provision of advance notice and the failure of the sample collector to observe directly the act of urination—that contribute sig-

In sum, we believe the Government has demonstrated that its compelling interests in safeguarding our borders and the public safety outweigh the privacy expectations of employees who seek to be promoted to positions that directly involve the interdiction of illegal drugs or that require the incumbent to carry a firearm. We hold that the testing of these employees is reasonable under the Fourth Amendment.

## C

We are unable, on the present record, to assess the reasonableness of the Government's testing program insofar as it covers employees who are required "to handle classified material." App. 17. We readily agree that the Government has a compelling interest in protecting truly sensitive information from those who, "under compulsion of circumstances or for other reasons, . . . might compromise [such] information." *Department of Navy* v. *Egan*, 484 U. S. 518, 528 (1988). See also *United States* v. *Robel*, 389 U. S. 258, 267 (1967) ("We have recognized that, while the Constitution protects against invasions of individual rights, it does not withdraw from the Government the power to safeguard its vital interests. . . . The Government can deny access to its secrets to those who would use such information to harm the Nation"). We also agree that employees who seek promotions to positions where they would handle sensitive information can be required to submit to a urine test under the Service's screening program, especially if the positions covered under this category require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectations of privacy in respect of a urinalysis test. Cf. *Department of Navy* v. *Egan*, *supra*, at 528 (noting that the Executive Branch generally subjects those desir-

nificantly to diminish the program's intrusion on privacy. See *supra*, at 672–673, n. 2. Thus, under petitioners' view, "the testing program would be more likely to be constitutional if it were more pervasive and more invasive of privacy." 816 F. 2d, at 180.

ing a security clearance to "a background investigation that varies according to the degree of adverse effect the applicant could have on the national security").

It is not clear, however, whether the category defined by the Service's testing directive encompasses only those Customs employees likely to gain access to sensitive information. Employees who are tested under the Service's scheme include those holding such diverse positions as "Accountant," "Accounting Technician," "Animal Caretaker," "Attorney (All)," "Baggage Clerk," "Co-op Student (All)," "Electric Equipment Repairer," "Mail Clerk/Assistant," and "Messenger." App. 42–43. We assume these positions were selected for coverage under the Service's testing program by reason of the incumbent's access to "classified" information, as it is not clear that they would fall under either of the two categories we have already considered. Yet it is not evident that those occupying these positions are likely to gain access to sensitive information, and this apparent discrepancy raises in our minds the question whether the Service has defined this category of employees more broadly than is necessary to meet the purposes of the Commissioner's directive.

We cannot resolve this ambiguity on the basis of the record before us, and we think it is appropriate to remand the case to the Court of Appeals for such proceedings as may be necessary to clarify the scope of this category of employees subject to testing. Upon remand the Court of Appeals should examine the criteria used by the Service in determining what materials are classified and in deciding whom to test under this rubric. In assessing the reasonableness of requiring tests of these employees, the court should also consider pertinent information bearing upon the employees' privacy expectations, as well as the supervision to which these employees are already subject.

### III

Where the Government requires its employees to produce urine samples to be analyzed for evidence of illegal drug

use, the collection and subsequent chemical analysis of such samples are searches that must meet the reasonableness requirement of the Fourth Amendment. Because the testing program adopted by the Customs Service is not designed to serve the ordinary needs of law enforcement, we have balanced the public interest in the Service's testing program against the privacy concerns implicated by the tests, without reference to our usual presumption in favor of the procedures specified in the Warrant Clause, to assess whether the tests required by Customs are reasonable.

We hold that the suspicionless testing of employees who apply for promotion to positions directly involving the interdiction of illegal drugs, or to positions that require the incumbent to carry a firearm, is reasonable. The Government's compelling interests in preventing the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life of the citizenry outweigh the privacy interests of those who seek promotion to these positions, who enjoy a diminished expectation of privacy by virtue of the special, and obvious, physical and ethical demands of those positions. We do not decide whether testing those who apply for promotion to positions where they would handle "classified" information is reasonable because we find the record inadequate for this purpose.

The judgment of the Court of Appeals for the Fifth Circuit is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

For the reasons stated in my dissenting opinion in *Skinner* v. *Railway Labor Executives' Assn., ante,* p. 635, I also dissent from the Court's decision in this case. Here, as in *Skinner,* the Court's abandonment of the Fourth Amendment's express requirement that searches of the person rest on

probable cause is unprincipled and unjustifiable. But even if I believed that balancing analysis was appropriate under the Fourth Amendment, I would still dissent from today's judgment for the reasons stated by JUSTICE SCALIA in his dissenting opinion, *post* this page, and for the reasons noted by the dissenting judge below relating to the inadequate tailoring of the Customs Service's drug-testing plan. See 816 F. 2d 170, 182–184 (CA5 1987) (Hill, J.).

JUSTICE SCALIA, with whom JUSTICE STEVENS joins, dissenting.

The issue in this case is not whether Customs Service employees can constitutionally be denied promotion, or even dismissed, for a single instance of unlawful drug use, at home or at work. They assuredly can. The issue here is what steps can constitutionally be taken to *detect* such drug use. The Government asserts it can demand that employees perform "an excretory function traditionally shielded by great privacy," *Skinner* v. *Railway Labor Executives' Assn.*, *ante*, at 626, while "a monitor of the same sex . . . remains close at hand to listen for the normal sounds," *ante*, at 661, and that the excretion thus produced be turned over to the Government for chemical analysis. The Court agrees that this constitutes a search for purposes of the Fourth Amendment — and I think it obvious that it is a type of search particularly destructive of privacy and offensive to personal dignity.

Until today this Court had upheld a bodily search separate from arrest and without individualized suspicion of wrongdoing only with respect to prison inmates, relying upon the uniquely dangerous nature of that environment. See *Bell* v. *Wolfish*, 441 U. S. 520, 558–560 (1979). Today, in *Skinner*, we allow a less intrusive bodily search of railroad employees involved in train accidents. I joined the Court's opinion there because the demonstrated frequency of drug and alcohol use by the targeted class of employees, and the demonstrated connection between such use and grave harm, rendered the search a reasonable means of protecting society.

I decline to join the Court's opinion in the present case because neither frequency of use nor connection to harm is demonstrated or even likely. In my view the Customs Service rules are a kind of immolation of privacy and human dignity in symbolic opposition to drug use.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." While there are some absolutes in Fourth Amendment law, as soon as those have been left behind and the question comes down to whether a particular search has been "reasonable," the answer depends largely upon the social necessity that prompts the search. Thus, in upholding the administrative search of a student's purse in a school, we began with the observation (documented by an agency report to Congress) that "[m]aintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems." *New Jersey* v. *T. L. O.*, 469 U. S. 325, 339 (1985). When we approved fixed checkpoints near the Mexican border to stop and search cars for illegal aliens, we observed at the outset that "the Immigration and Naturalization Service now suggests there may be as many as 10 or 12 million aliens illegally in the country," and that "[i]nterdicting the flow of illegal entrants from Mexico poses formidable law enforcement problems." *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 551–552 (1976). And the substantive analysis of our opinion today in *Skinner* begins, "[t]he problem of alcohol use on American railroads is as old as the industry itself," and goes on to cite statistics concerning that problem and the accidents it causes, including a 1979 study finding that "23% of the operating personnel were 'problem drinkers.'" *Skinner, ante,* at 606, and 607, n. 1.

The Court's opinion in the present case, however, will be searched in vain for real evidence of a real problem that will be solved by urine testing of Customs Service employees.

Instead, there are assurances that "[t]he Customs Service is our Nation's first line of defense against one of the greatest problems affecting the health and welfare of our population," *ante*, at 668; that "[m]any of the Service's employees are often exposed to [drug smugglers] and to the controlled substances [they seek] to smuggle into the country," *ante*, at 669; that "Customs officers have been the targets of bribery by drug smugglers on numerous occasions, and several have been removed from the Service for accepting bribes and other integrity violations," *ibid.;* that "the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment," *ante*, at 670; that the "national interest in self-protection could be irreparably damaged if those charged with safeguarding it were, because of their own drug use, unsympathetic to their mission of interdicting narcotics," *ibid.;* and that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force," *ante*, at 671. To paraphrase Churchill, all this contains much that is obviously true, and much that is relevant; unfortunately, what is obviously true is not relevant, and what is relevant is not obviously true. The only pertinent points, it seems to me, are supported by nothing but speculation, and not very plausible speculation at that. It is not apparent to me that a Customs Service employee who uses drugs is significantly more likely to be bribed by a drug smuggler, any more than a Customs Service employee who wears diamonds is significantly more likely to be bribed by a diamond smuggler—unless, perhaps, the addiction to drugs is so severe, and requires so much money to maintain, that it would be detectable even without benefit of a urine test. Nor is it apparent to me that Customs officers who use drugs will be appreciably less "sympathetic" to their drug-interdiction mission, any more than police officers who exceed the speed limit in their private cars are appreciably less

sympathetic to their mission of enforcing the traffic laws. (The only difference is that the Customs officer's individual efforts, if they are irreplaceable, can theoretically affect the availability of his own drug supply—a prospect so remote as to be an absurd basis of motivation.) Nor, finally, is it apparent to me that urine tests will be even marginally more effective in preventing gun-carrying agents from risking "impaired perception and judgment" than is their current knowledge that, if impaired, they may be shot dead in unequal combat with unimpaired smugglers—unless, again, their addiction is so severe that no urine test is needed for detection.

What is absent in the Government's justifications—notably absent, revealingly absent, and as far as I am concerned dispositively absent—is the recitation of *even a single instance* in which any of the speculated horribles actually occurred: an instance, that is, in which the cause of bribetaking, or of poor aim, or of unsympathetic law enforcement, or of compromise of classified information, was drug use. Although the Court points out that several employees have in the past been removed from the Service for accepting bribes and other integrity violations, and that at least nine officers have died in the line of duty since 1974, *ante*, at 669, there is no indication whatever that these incidents were related to drug use by Service employees. Perhaps concrete evidence of the severity of a problem is unnecessary when it is so well known that courts can almost take judicial notice of it; but that is surely not the case here. The Commissioner of Customs himself has stated that he "believe[s] that Customs is largely drug-free," that "[t]he extent of illegal drug use by Customs employees was not the reason for establishing this program," and that he "hope[s] and expect[s] to receive reports of very few positive findings through drug screening." App. 10, 15. The test results have fulfilled those hopes and expectations. According to the Service's counsel, out of 3,600 employees

tested, no more than 5 tested positive for drugs. See *ante*, at 673.

The Court's response to this lack of evidence is that "[t]here is little reason to believe that American workplaces are immune from [the] pervasive social problem" of drug abuse. *Ante*, at 674. Perhaps such a generalization would suffice if the workplace at issue could produce such catastrophic social harm that no risk whatever is tolerable—the secured areas of a nuclear power plant, for example, see *Rushton* v. *Nebraska Public Power District*, 844 F. 2d 562 (CA8 1988). But if such a generalization suffices to justify demeaning bodily searches, without particularized suspicion, to guard against the bribing or blackmailing of a law enforcement agent, or the careless use of a firearm, then the Fourth Amendment has become frail protection indeed. In *Skinner*, *Bell*, *T. L. O.*, and *Martinez-Fuerte*, we took pains to establish the existence of special need for the search or seizure— a need based not upon the existence of a "pervasive social problem" combined with speculation as to the effect of that problem in the field at issue, but rather upon well-known or well-demonstrated evils *in that field*, with well-known or well-demonstrated consequences. In *Skinner*, for example, we pointed to a long history of alcohol abuse in the railroad industry, and noted that in an 8-year period 45 train accidents and incidents had occurred because of alcohol- and drug-impaired railroad employees, killing 34 people, injuring 66, and causing more than $28 million in property damage. *Ante*, at 608. In the present case, by contrast, not only is the Customs Service thought to be "largely drug-free," but the connection between whatever drug use may exist and serious social harm is entirely speculative. Except for the fact that the search of a person is much more intrusive than the stop of a car, the present case resembles *Delaware* v. *Prouse*, 440 U. S. 648 (1979), where we held that the Fourth Amendment prohibited random stops to check drivers' licenses and motor vehicle registrations. The contribution of this practice to highway

safety, we concluded, was "marginal at best" since the number of licensed drivers that must be stopped in order to find one unlicensed one "will be large indeed." *Id.*, at 660.

Today's decision would be wrong, but at least of more limited effect, if its approval of drug testing were confined to that category of employees assigned specifically to drug interdiction duties. Relatively few public employees fit that description. But in extending approval of drug testing to that category consisting of employees who carry firearms, the Court exposes vast numbers of public employees to this needless indignity. Logically, of course, if those who carry guns can be treated in this fashion, so can all others whose work, if performed under the influence of drugs, may endanger others—automobile drivers, operators of other potentially dangerous equipment, construction workers, school crossing guards. A similarly broad scope attaches to the Court's approval of drug testing for those with access to "sensitive information."[1] Since this category is not limited to

---

[1] The Court apparently approves application of the urine tests to personnel receiving access to "sensitive information." *Ante*, at 677. Since, however, it is unsure whether "classified material" is "sensitive information," it remands with instructions that the Court of Appeals "examine the criteria used by the Service in determining what materials are classified and in deciding whom to test under this rubric." *Ante*, at 678. I am not sure what these instructions mean. Surely the person who classifies information *always* considers it "sensitive" in some sense—and the Court does not indicate what particular sort of sensitivity is crucial. Moreover, it seems to me most unlikely that "the criteria used by the Service in determining what materials are classified" are any different from those prescribed by the President in his Executive Order on the subject, see Exec. Order No. 12356, 3 CFR 166 (1982 Comp.)—and if there is a difference it is probably unlawful, see § 5.4(b)(2), *id.*, at 177. In any case, whatever idiosyncratic standards for classification the Customs Service might have would seem to be irrelevant, inasmuch as the rule at issue here is not limited to material classified *by the Customs Service*, but includes (and may well apply principally to) material classified elsewhere in the Government—for example, in the Federal Bureau of Investigation, the Drug Enforcement Administration, or the State Department—and conveyed to the Service. See App. 24–25.

Service employees with drug interdiction duties, nor to "sensitive information" specifically relating to drug traffic, today's holding apparently approves drug testing for all federal employees with security clearances — or, indeed, for all federal employees with valuable confidential information to impart. Since drug use is not a particular problem in the Customs Service, employees throughout the Government are no less likely to violate the public trust by taking bribes to feed their drug habit, or by yielding to blackmail. Moreover, there is no reason why this super-protection against harms arising from drug use must be limited to public employees; a law requiring similar testing of private citizens who use dangerous instruments such as guns or cars, or who have access to classified information, would also be constitutional.

There is only one apparent basis that sets the testing at issue here apart from all these other situations — but it is not a basis upon which the Court is willing to rely. I do not believe for a minute that the driving force behind these drug-testing rules was any of the feeble justifications put forward by counsel here and accepted by the Court. The only plausible explanation, in my view, is what the Commissioner himself offered in the concluding sentence of his memorandum to Customs Service employees announcing the program: "Implementation of the drug screening program would set an important example in our country's struggle with this most serious threat to our national health and security." App. 12. Or as respondent's brief to this Court asserted: "[I]f a law enforcement agency and its employees do not take the law seriously, neither will the public on which the agency's effectiveness depends." Brief for Respondent 36. What better way to show that the Government is serious about its "war on drugs" than to subject its employees on the front line of that war to this invasion of their privacy and affront to their dignity? To be sure, there is only a slight chance that it will prevent some serious public harm resulting from Service employee drug use, but it will show to the world that the

Service is "clean," and—most important of all—will demonstrate the determination of the Government to eliminate this scourge of our society! I think it obvious that this justification is unacceptable; that the impairment of individual liberties cannot be the means of making a point; that symbolism, even symbolism for so worthy a cause as the abolition of unlawful drugs, cannot validate an otherwise unreasonable search.

There is irony in the Government's citation, in support of its position, of Justice Brandeis' statement in *Olmstead* v. *United States,* 277 U. S. 438, 485 (1928) that "[f]or good or for ill, [our Government] teaches the whole people by its example." Brief for Respondent 36. Brandeis was there *dissenting* from the Court's admission of evidence obtained through an unlawful Government wiretap. He was not praising the Government's example of vigor and enthusiasm in combatting crime, but condemning its example that "the end justifies the means," 277 U. S., at 485. An even more apt quotation from that famous Brandeis dissent would have been the following:

> "[I]t is . . . immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Id.,* at 479.

Those who lose because of the lack of understanding that begot the present exercise in symbolism are not just the Customs Service employees, whose dignity is thus offended, but all of us—who suffer a coarsening of our national manners that ultimately give the Fourth Amendment its content, and who become subject to the administration of federal officials whose respect for our privacy can hardly be greater than the small respect they have been taught to have for their own.