**Walker L. CHANDLER, Sharon T. Harris, and James D. Walker**

v.

**Honorable Zell D. MILLER, Max Cleland, and James G. Ledbetter.**

**Civil No. 1:94–cv–1298–ODE.**

United States District Court, N.D. Georgia, Atlanta Division.

June 21, 1994.

Walker Lawrence Chandler, Office of Walker Lawrence Chandler, Zebulon, GA, Harvey D. Harkness, Awtrey & Parker, Marietta, GA, for plaintiffs.

Michael E. Hobbs, Office of State Attorney General, Atlanta, GA, for defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This civil action is before the court on Plaintiffs' motion for a preliminary injunction. Both sides filed briefs in support of their positions pursuant to the court's order of May 24, 1994. The court heard from both sides at a hearing in open court on June 17, 1994.

Plaintiffs, members of the Libertarian Party, are candidates for state office in Georgia. Plaintiff Walker L. Chandler seeks the office of Lieutenant Governor. Plaintiff Sharon T. Harris seeks the office of Commissioner of Agriculture. Plaintiff James D. Walker seeks the office of Representative, 85th House District, General Assembly of Georgia.

Plaintiffs seek a declaration that O.C.G.A. § 21–2–140 is unconstitutional, coupled with an injunction forbidding Defendants from enforcing § 21–2–140. In brief, the challenged statute requires candidates for state office "to certify that such candidate has tested negative for illegal drugs." § 21–2–140(b). Plaintiffs allege that § 21–2–140 conflicts with several provisions of both the federal and Georgia constitutions. However, both sides have focused their arguments on Plaintiffs' claim that § 21–2–140 violates their rights under the Fourth Amendment to the federal constitution.

A preliminary injunction is an extraordinary remedy which should only be granted if the moving party clearly establishes: (1) a substantial likelihood that he will ultimately prevail on the merits; (2) a showing that he will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to him outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Cunningham v. Adams,* 808 F.2d 815, 819 (11th Cir.1987). The court first addresses whether Plaintiffs have shown that they have a substantial likelihood of prevailing on the merits of their Fourth Amendment claim.

The Fourth Amendment prohibits *unreasonable* searches and seizures. The issue before the court is whether it is unreasonable for Georgia to require candidates for state office to provide the certification at issue despite the absence of "a warrant, ... probable cause, ... [or] any measure of individualized suspicion." *See National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989).[1] The standard that governs the court's analysis follows:

Defendants analyze the certification as if it did involve a search and contend that there is no constitutional violation.

1. Defendants do not concede that the urinalysis certification at issue constitutes a search for purposes of the Fourth Amendment. Nevertheless,

[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.

*Von Raab,* 489 U.S. at 665–66, 109 S.Ct. at 1390–91 (citing *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 619–20, 109 S.Ct. 1402, 1414–15, 103 L.Ed.2d 639 (1989)). Georgia's interest in the operation of each elective office at issue here gives rise to the "special governmental needs" that trigger the *Von Raab* balancing test. *See Willner v. Thornburgh,* 928 F.2d 1185, 1188 (D.C.Cir.) ("*Railway Labor Executives,* [489 U.S. at 618–20], 109 S.Ct. at 1414, on which *Von Raab* relied in formulating the [balancing test], stated that the government's interest in the 'operation of a government office'—here the Department of Justice—presents such 'special needs.' [489 U.S. at 664–65], 109 S.Ct. at 1390."), *cert. denied,* 502 U.S. 1020, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991). For the reasons that follow, the court is persuaded that the importance of the offices sought, as well as the relative unintrusiveness of the testing procedure at issue, make it unlikely that Plaintiffs will prevail on their claim that § 21–2–140 violates the Fourth Amendment.

In *Von Raab,* the Supreme Court noted that the use of illicit drugs is "one of the greatest problems affecting the health and welfare of our population." *Id.,* 489 U.S. at 668, 109 S.Ct. at 1392. The Supreme Court thus sanctioned the suspicionless testing of Treasury Department employees who sought "promotion to positions directly involving the interdiction of illegal drugs, or to positions that require the incumbent to carry a firearm." *Id.* at 679, 109 S.Ct. at 1398. The Supreme Court reasoned that

> [t]he Government's compelling interests in preventing the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life

of the citizenry outweigh the privacy interests of those who seek promotion to these positions, who enjoy a diminished expectation of privacy by virtue of the special, and obvious, physical and ethical demands of those positions.

*Id.*

The offices at issue in this case do not require the occupants to use a firearm; nor are the offices frontline positions in the effort to interdict the drug trade. Nevertheless, the offices are held by persons who are the elected representatives of the people of the State of Georgia. From this fact, the court does not believe it can be disputed that the offices are more than ordinary government jobs; i.e., the offices are "special." Moreover, all of the offices place ethical demands on the incumbents that do not attend regular government jobs.[2] Given these facts, Georgia is justifiably concerned that those who seek elective office not be drug abusers, both because of the power many elected officials have to influence the effort to interdict the drug trade (through, for example, the legislative process), and because of the negative societal effects (such as cynicism and despair) which would flow from the revelation that an elected official is a drug abuser.

The foregoing analysis shows that valid, compelling concerns motivated Georgia to impose § 21–2–140's certification requirement. The court balances the intrusiveness of the certification requirement against these valid, compelling concerns. In their brief, Defendants point out that

> the specimen is produced by the candidate under circumstances which are largely under the candidate's control. The candidate can control the date and time the specimen is produced, and can and does control the location where the specimen is produced, to include any number of medical testing laboratories across Georgia, as well as the offices of the candidate's personal physician. There certainly is no threat, coercion or force involved, the only motivation for the testing, as far as the candidate is

---

**2.** *Cf.* Ga. Const. art. I, § II, ¶ I ("Public officers are the trustees and servants of the people and

are at all times amenable to them.").

concerned, being the desire to qualify and run for state office.

(State Defendants' Brief in Response to Plaintiffs' Assertions at 3–4.)[3] Once the candidate produces a specimen, the only governmental intrusion is a chain-of-custody requirement. After the test is performed, the candidate receives his certificate, presumably through the mail. Since the candidate controls whether or not the certificate is filed, there is no compulsory dissemination of the information contained in the certificate. Thus, if the urinalysis reveals a positive result for drugs, the candidate will not be able to qualify, but no one need know that the reason for the lack of qualification is the positive drug result. Given these facts, the court finds that the steps necessary for Plaintiffs to comply with the certification requirement would consist at most of a de minimis intrusion on Plaintiffs' privacy.

Based on the foregoing analysis, the court finds that Defendants likely would prevail on the *Von Raab* balancing test. The court now turns to Plaintiffs' contention that § 21–2–140 should be invalidated because it fails to accomplish the goal of preventing drug abusers from seeking and holding public office.

Plaintiffs argue that the enforcement of § 21–2–140 should be enjoined because the statute will not achieve its presumed goal of barring drug abusers from public office. Plaintiffs note that since the test date is no secret, a drug abuser can abstain from the use of drugs before the test so as to achieve a negative result. Plaintiffs also note that a one-time test will have no effect on drug abuse that occurs after the test. Finally, Plaintiffs note that there is the potential for adulteration of urine samples given the latitude accorded candidates in producing the samples at their doctors' offices.

The court need not address Plaintiffs' arguments, for the Supreme Court's decision in *Von Raab* persuades the court that those arguments do not justify enjoining enforcement of § 21–2–140 as an irrational law. The Supreme Court knew the plan at issue in *Von Raab* only contemplated a one-time drug test, for it recognized the dissent by a judge on the Court of Appeals panel that "persons already employed in sensitive positions are not subject to this test." *Id.* at 664, 109 S.Ct. at 1390.[4] Moreover, the plaintiffs in *Von Raab* advanced some of the same arguments as Plaintiffs do here. *Id.* at 673, 109 S.Ct. at 1395 ("Petitioners contend that ... illegal drug users can avoid detection with ease by temporary abstinence or by surreptitious adulteration of their urine specimens.").[5] Nevertheless, the Supreme Court rejected these arguments and concluded its opinion by holding that "suspicionless testing of employees *who apply for promotion to* positions directly involving the interdiction of illegal drugs, or to positions that require the incumbent to carry a firearm, is reasonable." *Id.* at 679, 109 S.Ct. at 1398 (emphasis added). Given this precedent, the court cannot question the validity of § 21–2–140, since the alleged infirmities in it are essentially the same as those that were alleged to exist in the plan at issue in *Von Raab*.

---

**3.** At the June 17 hearing, Plaintiffs conceded the accuracy of the foregoing description of the method for collecting a urine specimen.

**4.** The majority members of the Court of Appeals panel rebutted the dissent's objection as follows:

Our brother ... advances as a basis for his dissent that the test is not sufficiently effective in other ways: employees currently in sensitive positions are not tested and those transferred to sensitive positions are not again tested. Employees in sensitive positions are, however, subject to supervision that may be more intensive than employees in routine tasks. Moreover, offsetting the lesser effectiveness that is achieved by testing only applicants for sensitive jobs is the fact that these persons have volunteered for the jobs and have, in effect, by not withdrawing after notice, at least acquiesced in the test. The dissent, inconsistently it seems to us, argues that the testing program would be more likely to be constitutional if it were more pervasive and more invasive of privacy.

*National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 180 (5th Cir.1987), *aff'd in part and vacated in part*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The court finds that many of the arguments made above apply in this case, given the scrutiny that the holders of elective office experience.

**5.** In fairness, the court notes that the sample collection procedures in *Von Raab* were considerably more stringent than those that exist here.

Accordingly, Plaintiffs' motion for a preliminary injunction is DENIED.