**Parris MOXLEY, Plaintiff,**

v.

**REGIONAL TRANSIT SERVICES, John A. Garrity, Brent Morris, and Dr. Earl Lipman, Defendants.**

**No. CIV–87–0998T.**

United States District Court, W.D. New York.

Oct. 17, 1989.

Richard Evans, pro bono, Rochester, N.Y., for plaintiff.

Harris, Beach & Wilcox (Peter J. Spinelli, of counsel), Rochester, N.Y., for defendants.

TELESCA, Chief Judge.

Plaintiff Parris Moxley commenced this action *pro se* pursuant to 42 U.S.C. § 1983, claiming that defendant Regional Transit Authority ("RTS") unlawfully implemented a drug-screening policy, and that a subsequent urinalysis drug test performed during a routine return-to-work physical violated his Fourth Amendment rights. Following the appointment of counsel and after completion of pre-trial discovery, both parties have moved for summary judgment. For the reasons discussed below, the defendants' motion for summary judgment is granted.

Defendant RTS is a wholly owned subsidiary corporation of Rochester–Genesee Regional Transportation Authority, a public authority created by New York statute. As the provider of bus service throughout the greater Monroe County area, RTS employs approximately 320 bus drivers who are in turn responsible for carrying over 18,000,000 passengers a year. These bus drivers generally work alone and provide transportation services with only a limited amount of supervision. The safe and efficient operation of RTS' transportation services rests essentially with these bus operators alone.

In 1985, the General manager of RTS, John Garrity, became concerned with reports of drug use among employees in the transportation industry.[1] Mr. Garrity consulted other transportation authorities with existing drug screening programs in place and personally met with representatives of the RTS bus drivers union, Amalgamated Transit Union ("ATU"), to discuss the need for and development of a similar drug testing policy for RTS. Although ATU declined to take part in the development of such a policy, RTS was nonetheless able to draft a proposed drug screening program by early December, 1985. ATU received and reviewed this draft but did not request any changes or modifications. The policy accordingly became a work rule applicable to all RTS employees effective as of March 1, 1986. Copies were posted at various company facilities and distributed to individual employees with their paychecks.

The policy in effect in 1986 authorized drug screen and/or blood alcohol tests to be administered to RTS employees upon

---

1. Mr. Garrity's concern originated in part from a Los Angeles Transit Authority report which estimated that 33% of its drivers had some involvement with drugs.

   Preliminary data from a NIDA survey, "National Survey on Drug Abuse," supports Mr. Garrity's initial concern and demonstrates the need for the testing of public employees in safety sensitive positions. Of individuals surveyed in the 18–25 age category, 21.9% reported using marijuana and 7.7% reported using cocaine within the past month. While the figures were lower for the 26 year old and over category

(9.5% had used marijuana and 2.1% had used cocaine within the past month), the report indicated that individuals in that age group were most likely to increase their use of most drugs. 53 Fed.Reg. 25910 (1988). Statistics such as these no doubt led the Supreme Court to conclude that "drug abuse is one of the most serious problems confronting our society today … [and t]here is little reason to believe that American workplaces are immune from this pervasive social problem." *National Treasury Employees Union v. Von Raab,* — U.S. ——, 109 S.Ct. 1384, 1395, 103 L.Ed.2d 685 (1989).

probable cause or as part of routine 19A,[2] back-to-work or pre-employment physicals. Employees who tested positive while taking either a 19–A examination or back-to-work physical were to be placed "out-of-service" until such time as RTS management deemed appropriate.

On July 1, 1986, the plaintiff submitted a urine specimen during the course of a routine return-to-work physical conducted by Dr. Earl Lipman. The plaintiff's sample was labeled for identification, tested for certain metabolites and then sent to Rochester General Hospital for a drug analysis. On July 2, 1986, after successfully completing a required bus driver retraining session, the plaintiff was notified by Superintendent Brent Morse that an initial and confirmatory EMIT assay performed on his sample had revealed the presence of cocaine. The plaintiff was offered but declined an opportunity to take a new test, indicating that he had used cocaine the night before on July 1 and would now test positive if he submitted to a new urinalysis exam. The plaintiff was thereupon discharged from his employment with RTS. A GC/MS test performed on January 7, 1987 confirmed the presence of cocaine in his sample.

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure allows a trial court to grant summary judgment if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of initially showing that there are no genuine disputes as to any material facts, and any inferences drawn from the evidence proffered must be viewed in the light most favorable to the party opposing summary judgment. *Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986). Whether there are ultimately material facts in dispute is determined by the substantive law

governing the issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242–43, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986).

■ Plaintiff argues as an initial matter that defendant RTS violated its collective bargaining agreement with his union when it unilaterally implemented its drug-screening policy in 1986. However, as this policy clearly altered the terms and conditions of employment to which union employees were subject, it is commited to the exclusive nondelegable jurisdiction of the Public Employment Relations Board. N.Y.Civ. Serv.Law § 205(5)(d) (McKinney 1983); *Collins v. Manhattan & Bronx Surface Transit Operating Authority,* 62 N.Y.2d 361, 373, 477 N.Y.S.2d 91, 465 N.E.2d 811 (1984). Accordingly, I grant defendants summary judgment on this issue and turn now to plaintiff's Fourth Amendment challenge.

■ The Supreme Court's recent decisions in *Skinner v. Railway Labor Executives Association,* —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab,* —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), firmly establish that compulsory urinalysis by the Government of its employees constitutes a "search" under the Fourth Amendment. As the defendants concede that RTS is a governmental entity, the sole question before this Court is whether its drug screening program in effect in 1986 survives Fourth Amendment scrutiny both on its face and as applied to the plaintiff.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures shall not be violated...." The Amendment guarantees individual privacy and dignity against certain arbitrary and unreasonable intrusions by the Government. While most searches are deemed unreasonable unless accomplished pursuant to a judicial warrant issued upon probable cause, certain recognized exceptions have arisen "when 'special needs, be-

---

**2.** A 19–A physical is a biennial medical examination conducted pursuant to Art. 19A, § 509–g

of the N.Y.Veh. & Traf.Law (McKinney 1986).

yond the normal need for law enforcement, make ... [such] requirement[s] impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 3167, 97 L.Ed.2d 709 (1987). Where a Fourth Amendment intrusion serves such special governmental needs, its reasonableness and thus, its constitutionality, are determined by balancing the governmental interests involved against the individual's privacy expectations at risk. *Von Raab*, 109 S.Ct. at 1390 (1989); *Skinner*, 109 S.Ct. at 1414; *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987).

It is clear that the RTS' drug testing policy in effect in 1986 was designed to serve needs other than those of ordinary law enforcement. The test results were received not for the purposes of criminal prosecution, but as a means of insuring the safe and efficient transportation of both passengers and employees. This interest, no less than the Government's interest in drug interdiction in *Von Raab, supra,* or its concern for safe rail transportation at issue in *Skinner, supra,* presents a special need justifying departure from the usual warrant and probable cause requirements. *Skinner*, 109 S.Ct. at 1415–17; *Von Raab*, 109 S.Ct. at 1391–92.

In balancing this interest against the privacy expectations of RTS employees, it must be noted that the Government's interest in the efficient and proper operation of the workplace is at its zenith where public's lives depend on the reliable and sober performance of Government employees. *Amalgamated Transit Union v. Cambria County Transit Authority*, 691 F.Supp. 898, 904 (W.D.Pa.1988); *see also O'Connor*, 107 S.Ct. at 1501. This is especially true where, as here, public transportation services involving buses are implicated. Such vehicles, though perhaps harmless while idle, "become[ ] lethal when operated negligently by persons who are under the influence of alcohol or drugs." *Skinner*, 109 S.Ct. at 1419. Indeed, "bus drivers[, along with] ... mechanics, bear direct and daily responsibility for more lives than any other type of public employee." *Amalgamated Transit Union*, 691 F.Supp. at 904.

The difficulty of identifying bus drivers impaired by drugs or alcohol compounds the threat which such use poses to the public. "An impaired employee ... will seldom display any outward 'signs detectable by the layperson or, in many cases, even the physician.'" *Skinner*, 109 S.Ct. at 1419 (quoting 50 Fed.Reg. 31526 (1985)). Furthermore, bus drivers typically receive only limited supervision at the beginning and end of their shifts and can thus "work [almost] totally unobserved." *Amalgamated Transit Union*, 691 F.Supp. at 905. Indeed, the facts of this case provide a frightening example of the difficulty inherent in detecting employees who are chronic drug users. Although a daily user of cocaine and heroin for nearly two years prior to his discharge, the plaintiff was able to conceal his chemical dependency due in part to the limited contact he had with his supervisors and fellow employees.

■ The inherent difficulty in detecting drug abuse among bus drivers, coupled with the safety concerns such use poses to the public, clearly outweighs the limited intrusions on the individual privacy expectations involved. Employees responsible for public transportation have diminished privacy expectations simply "by reason of their participation in an industry that is regulated pervasively to ensure safety." *Skinner*, 109 S.Ct. at 1418. Indeed, as an employee of RTS since 1974, plaintiff was no doubt accustomed to having the State monitor his physical and mental condition. Under New York law, for example, bus drivers are required to submit to biennial physical examinations, are prohibited from operating a bus while their ability or alertness is impaired or likely to become impaired, are prohibited from possessing while on duty or consuming within six hours of going on duty any drug, controlled substance or intoxicating liquor, and may be disqualified from driving a bus for being convicted of operating a motor vehicle while under the influence of alcohol or drugs. N.Y.Veh. & Traf.Law §§ 509–a *et seq.* (McKinney 1986). These laws reflect the Government's recognition that the "successful performance of ... [a bus driver's] duties depends uniquely on their judg-

ment and dexterity." *Skinner* 109 S.Ct. at 1418. Accordingly, the plaintiff should reasonably have expected "intrusive inquiries" into his fitness and probity. *Von Raab*, 109 S.Ct. at 1394.

Plaintiff's reasonable expectations of privacy were further diminished because his drug screen occurred during a routine return to work physical. Such physicals have been conducted for many years by RTS and have included urine testing for albumen and protein. Supplementing a regular, pre-existing urinalysis procedure to include testing for the presence of drugs in addition to certain metabolites inflicts only a minimal intrusion on privacy interests. *Wrightsell v. City of Chicago*, 678 F.Supp. 727, 733–34 (N.D.Ill.1988); *Amalgamated Transit Union*, 691 F.Supp. at 903. On numerous occasions prior to July 1, 1986, plaintiff provided RTS with a urine specimen during a return-to-work physical or biennial medical examination without objection of any kind. The regularity of these urinalysis tests alleviated any possible "unsettling show of authority," *Delaware v. Prouse*, 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979), and reduced the likelihood of abuse or harassment, *Wrightsell*, 678 F.Supp. at 733.

Finally, the procedures prescribed by RTS significantly minimized the programs invasiveness on plaintiff's privacy interests. Plaintiff had several months' notice of the RTS drug screening policy and several days' notice of the July 1, 1986 return-to-work physical examination. *Von Raab*, 109 S.Ct. at 1394 n. 2. Indeed, the plaintiff consented in writing to the return to work physical and was aware that his urine would be tested for drugs before he submitted to a urinalysis. Finally, plaintiff was allowed to provide a urine specimen in the medical department laboratory without direct observation, and his urine was tested only for certain controlled substances. *Id.; Skinner*, 109 S.Ct. at 1418. In sum, these

privacy expectations, though far from insignificant, were clearly outweighed by RTS' compelling interest in the safe and efficient transportation of its passengers.

In addition to facially challenging the reasonableness of the 1986 RTS policy, plaintiff also claims that it was unconstitutional as applied to him. Specifically, plaintiff argues that RTS failed to initiate a written chain of custody form documenting the handling and transfer of his urine sample, failed to use reliable screening and confirmation techniques and neglected to notify him that a positive test result would lead to his termination. I find each of plaintiff's arguments to be without merit.

■ First, the unwritten procedures employed by RTS in 1986 provided sufficient safeguards to insure the accuracy of the plaintiff's test results. The record shows that the plaintiff was given a sealable plastic cup with his name on it, which he filled in a Medical Department bathroom to which he alone had access. His sample was subsequently retrieved and placed into a styrofoam insulated metal box. The plaintiff's sample, along with approximately four others, remained inside the nurse's station under supervision[3] until it was collected by a courier for Rochester General Hospital at the end of the morning. While more rigorous written chain of custody procedures would perhaps have been more reliable, I find that the precautions taken by RTS sufficiently minimized the likelihood of mishandling or adulteration of plaintiff's sample so as to satisfy due process standards. *Von Raab*, 109 S.Ct. at 1396.

■ Second, the record establishes that the initial EMIT positive assay results upon which RTS originally predicated plaintiff's discharge, were later confirmed by GC/MS analysis. Such confirmatory techniques are "highly accurate," *Von Raab*, 109 S.Ct. at 1394 n. 2, and insure both the soundness and reliability of the reported results.[4] I

---

3. Dr. Lipman's nurse, Rutha Wolfe, testified that a wall and counter separated the nurse's station from the reception area. Furthermore, because there were two other women besides Ms. Wolfe who worked in this area, "no one could get back there without ... [being] notic[ed]." Dep. Ru-

tha N. Wolfe, sworn to on October 12, 1988, at 23.

4. The fact that the GC/MS analysis was conducted nearly six months after the first EMIT assays were run did not undermine its efficacy

find it highly significant in this regard that the plaintiff was offered but declined an opportunity to submit to a second urinalysis exam on July 2, 1986, the day after his first exam. As he thereby prevented RTS from confirming the initial test results, he may not now claim that those results were inaccurate, unreliable or otherwise invalid.

■ Finally, I am unpersuaded that the plaintiff received inadequate notice as to the consequences of a positive test result. The RTS policy statement explicitly provides that "any discoveries made while taking a ... back to work physical will result in the employee being 'out of service' until such time as the Director of Human Resources, the Division head, and the Executive Director/General Manager deemed appropriate." A reasonable interpretation of this directive clearly forewarned the plaintiff that any detection of illicit drugs would jeopardize his position with the company and possibly result in an indefinite suspension or termination. Indeed, the vice president of the bus driver's union stated that one of the reasons for union opposition to the 1986 policy was that it effectively gave RTS the ability "to fire employees." (Dep. Gwindell Bradley, sworn to on February 13, 1989, at 31).

In sum, I find RTS' concern for the welfare of its employees and the safe and efficient transportation of its passengers a compelling interest sufficient to counterbalance the individual privacy expectations involved. Despite the impressive efforts of plaintiff's counsel, I am satisfied with the reasonableness of RTS' 1986 policy both on its face and as applied to the plaintiff and accordingly grant defendant's motion for summary judgment.

SO ORDERED.

---

as a confirmatory tool. In her affidavit, the plaintiff's expert witness, Dr. Jeanne M. Beno, objected only to the limited amount information on sample conditions included with the report, and not to the length of time that had elapsed since the initial assays had been run. Affidavit of Dr. Jeanne M. Beno, sworn to on June 27, 1989, at 7–8.