DENNIS, Circuit Judge,
dissenting:
I emphatically disagree with the majority’s conclusion that the state attorney general has shown that this case falls within the closely guarded “special needs” category recently recognized by the Supreme Court within which a state officer without reasonable individualized suspicion of wrongdoing may require a person to submit to an urinalysis drug test. In this case state medical school administrative officers, without reasonable individualized suspicion that a physician-resident trainee’s urine contained evidence of illegal drug usage (and in' the absence of any established drug testing policy) ordered her to submit to an urinalysis drug test, on pain of termination of her employment, residency training, and severe or fatal damage to her medical professional career. The state attorney general concedes that the state compelled drug test effected a search within the meaning of the Fourth and Fourteenth Amendments. See Defendants-Appellants’ Brief p. 11. Both the currently applicable law, and the clearly established law at the time the state officers ordered the physician-resident to submit to urinalysis drug testing (March, 1990), require that a state officer have an individualized reasonable suspicion that illegal drug use evidence is contained in a person’s urine before ordering her to submit to an urinalysis drug test. The majority’s erroneous conclusion that the state’s proffered “special need” for drug testing justified the suppression of the Fourth Amendment’s normal requirement of individualized suspicion led to its mistaken reversal of the district court’s *884 judgment implementing jury awards to the plaintiff of compensatory and punitive damages. Accordingly, I respectfully dissent.
I. Issues On Appeal
On appeal, the state attorney general, on behalf of the defendants-appellants, assigns and argues for reversal of the district court’s judgment and the plaintiffs jury-awarded damages on four issues: (1) The district court erred in denying defendants’ motion for judgment as a matter of law because no individualized suspicion was required to justify the defendants in compelling Dr. Pierce to submit to an urinalysis drug test; (2) Alternatively, the district court erred in not granting defendants’ motion for judgment as a matter of law because reasonable minds could not differ that the defendants had reasonable grounds to suspect that Dr. Pierce was using illegal drugs at the time she was ordered to submit to an urinalysis; (3) The district court erred in denying defendants’ motions for summary judgment and judgment as a matter of law because at the time the defendants ordered Dr. Pierce to take the drug test the law was not clearly established that an individualized reasonable suspicion of wrongdoing was required before a state officer could order a public employee or public professional school student to submit to an urinalysis drug test; and (4) The district court erred in denying judgment as a matter of law on the question of punitive damages.
That the state officers’ actions invaded an expectation of privacy that society is prepared to recognize as reasonable is not disputed. The state attorney general, on behalf of the defendants-appellants, expressly does “not contest that whether the actions that were taken constituted a ‘search’ within the meaning of the Fourth Amendment.” Defendants-Appellants’ Brief p. 11.
II. Analysis of Overlapping Issues

Issues 1. & 3. The clearly established law now and always has required that state officers have at least reasonable individualized suspicion of wrongdoing before ordering a free adult person to submit to an urinalysis drug test.

The currently applicable law and the clearly established law at the time the state officers ordered the physician-resident trainee to submit to urinalysis in March, 1990 require that a state officer have an individualized reasonable suspicion that a person’s urine contains evidence of illegal drug use before ordering her to submit to an urinalysis drug test. In 1989, the Supreme Court, in Skinner v. Railway Labor Executives’ Ass’n., 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), recognized a “special needs” category of cases involving train operators and Customs Service agents and permitted suspieionless government mandated urinalysis of such persons under the particular and unique circumstances and regulated drug testing programs in those cases. Previously, Supreme Court Justices, in dicta and separate opinions, had spoken of “special needs” in contexts other than urinalysis drug testing but clearly had not designated a “special needs” category for suspieionless searches or seizures. Subsequent to Skinner and Von Raab the Supreme Court, in Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), recognized a “special needs” category for suspi-eionless random sample urinalysis of secondary school athletes with parental consent under the particular, unique circumstances and detailed written drug-testing policy in that case. Recently, in Chandler v. Miller, — U.S. -, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), the Supreme Court held that a state’s statutory requirement that candidates for state office submit to an urinalysis drug test does not fit within the closely guarded “special needs” category of constitutionally permissible suspieionless searches established by Skinner, Von Raab and Ver-nonia and that those precedents remain the guides for determining whether any proffered “special needs” for suspieionless drug testing passes constitutional muster. In the present case, it is clear that the state officers’ order that the adult physician-resident trainee submit to urinalysis drug testing, which was not based on reasonable individu *885 alized suspicion, did not fit within the closely guarded “special needs” category of constitutionally permissible suspicionless searches, because the ad hoc drug test order was not supported by an established drug testing program or a showing of any of the factors necessary to justify a “special needs” category and suspieionless drug testing policy or program.

A. Overview, Including The Law At The Time Of The Urinalysis Drug Test Order In The Present Case And Prior Thereto.

The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Until the late 1960’s, the steadfast rule was that in order for a search to be “reasonable,” law enforcement officials must first obtain a warrant from a neutral and detached magistrate by establishing probable cause that a law had been violated; and that in the few specific situations in which obtaining a warrant was deemed impracticable probable cause was still required. See, e.g., Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). As the Supreme Court considered nontraditional applications of the Fourth Amendment, however, such as searches by public inspections officials, See Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and frisks by police officers, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it found it needed more flexibility than the warrant and probable cause requirements could provide. The Court began, in limited circumstances, to recognize specific permissible departures from the traditional probable cause requirement, after “balancing the need to search against the invasion which the search entails”. Camara, 387 U.S. at 537, 87 S.Ct. at 1735; See Terry, 392 U.S. at 21, 88 S.Ct. at 1879-80. The departures have been of two different kinds: (1) those requiring only reasonable individualized suspicion; and (2) those requiring no individualized suspicion but only a random or other nonarbitrary selection process. See Wayne R. LaFave, Computers, Urinals, and Fourth Amendment: Confessions of a Patron Saint, 94 Mioh. L. Rev. 2553, 2575-1576 (1996) [hereinafter LaFave]; Cf. Terry v. Ohio, supra, and Camara v. Municipal Court, supra.
Each situation in which the Supreme Court has created an exception that allows an intrusion without reasonable individualized suspicion is markedly different from the state mandated urinalysis test situation in the present case. In comparison, each of those cases is clearly distinguishable from the present case on one or more of the following grounds: (1) the nature of the intrusion was much less severe; (2) the magnitude of the governmental need for the search was far greater; and/or (3) it was impracticable or impossible to respond to the governmental need with the individualized suspicion requirement. See LaFave at 2577. (citing and referencing cases).
For example, the premises inspection cases do not involve a serious intrusion upon personal privacy because even the housing inspections, and especially the business inspections, are not “personal in nature.” Camara, 387 U.S. at 537, 87 S.Ct. at 1735. The concern of the inspector is directed toward such facilities as the plumbing, heating, ventilation, gas and electrical systems, and toward the accumulation of garbage and debris, and there is no rummaging through private papers and effects of the householder. By comparison, the type of search at issue in the present ease is very personal in nature, intruding upon “an excretory function traditionally shielded by great privacy.” Skinner, 489 U.S. at 626, 109 S.Ct. at 1418; LaFave at 2577-2578.
The present case is distinguishable from the “special needs” urinalysis cases, and from other Fourth Amendment cases, in which searches without individualized suspicion were permitted, because those cases involved far greater magnitudes of risks. The searches in those cases were responsive to *886 situations in which even one undetected instance of wrongdoing could have injurious consequences for a great number of people: as in the ease of building inspections, even a single safety code violation can cause fires and epidemics that ravage large urban areas. Camara, 387 U.S. at 535, 87 S.Ct. at 1734; as in airport screening, where even a single hijacked plane can result in the destruction of hundreds of human lives and millions of dollars of property. United States v. Edwards, 498 F.2d 496, 500 (2d Cir.1974); as in particular comprehensive drug-testing programs, in Skinner for example, where a single drug-impaired train operator could produce disastrous consequences including great human and property loss, Skinner, 489 U.S. at 628, 109 S.Ct. at 1419; in Von Raab, where a customs official using drugs could cause the noninterdiction of a sizable drug shipment and consequently injury to the lives of many, and perhaps a breach of national security, Von Raab, 489 U.S. at 670, 674, 109 S.Ct. at 1393, 1395; and in Vemonia in which the significant government interest in a drug free secondary educational and athletic environment has a national impact of great magnitude on vast numbers of school children who are not free adults but are under the guardianship of public school districts throughout the country. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); See LaFave at 2578.
Most important of all, the eases allowing a search without individualized suspicion upheld the suspicionless searches only after recognizing the Fourth Amendment’s general rule requiring at least reasonable individualized suspicion, and then pointed to sound reasons why that standard would be unworkable under the unusual circumstances presented. In Camara, the court emphasized that an individualized suspicion test was impracticable for safety inspections because evidence of code violations ordinarily was not observable from outside the premises. Camara, 387 U.S. at 537, 87 S.Ct. at 1735. Suspicionless searches of prisoners after contact visits are permissible precisely because the extent of scrutiny necessary to obtain individualized suspicion would cause obvious disruption of the confidentiality and intimacy that these visits are intended to afford. Bell v. Wolfish, 441 U.S. 520, 560 n. 40, 99 S.Ct. 1861, 1885 n. 40, 60 L.Ed.2d 447 (1979) In Skinner, requiring individualized suspicion for testing train operators after an accident was not feasible because “the scene of a serious rail accident is chaotic.” Skinner, 489 U.S. at 631, 109 S.Ct. at 1420. In Von Raab, the suspicion requirement for testing customs officials was impractical because it was “not feasible to subject [such] employees and their work product to the kind of day-today scrutiny that is the norm in more traditional office environments.” Von Raab, 489 U.S. at 674, 109 S.Ct. at 1395. The border search and airport search cases are obviously distinguishable because in each the authorities are in a now-or-never situation as to large numbers of travelers who could not feasibly have been subjected to prior unin-trusive scrutiny. See, e.g., United States v. Ramsey, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); United States v. Moreno, 475 F.2d 44 (5th Cir.1973); LaFave at 2578-2579.
By contrast, there is no comparable justification or precedent for allowing the state medical school administrative officers in the present case to order physician-resident trainee drug tests without individualized suspicion. Each relatively small group of residents is under constant supervision and/or observation by veteran doctors, nurses, hospital workers, administrators and peers. In this case, Dr. Pierce was one of only six residents in Texas Tech’s emergency medicine program. Plainly, there has been no showing that the reasonable individualized suspicion test would likely be ineffectual under the circumstances of the Physician-residents’ employment and training.

B. The Pre-Skinner Urinalysis Cases

Prior to Skinner v. Railway Labor Executives’ Ass’n., 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), the consensus of courts, which ruled upon the validity of urine tests for public employees required as a prerequisite some articulable basis for suspecting that the employee was using illegal drugs, usually framed as “rea *887 sonable suspicion.” See 4 LaFave, Seaech AND Seizure — A Treatise on the Fourth Amendment, § 103(e), p. 498 (3d ed.l996)(citing cases at n. 180); Miller, Mandatory Urinalysis Testing and the Privacy Rights of Subject Employees: Toward a General Rule of Legality Under the 'Fourth Amendment, 44 U.Pitt.L.Rev. 201, 218-230 (1986)(discuss-ing cases). “[V]irtually all the reported cases ... concluded that such testing is unconstitutional in the absence of some reasonable individualized suspicion.” Fraternal Order of Police v. City of Newark, 216 N.J.Super. 461, 524 A.2d 430, 436 (1987)(The “reasonable individualized suspicion test fairly accommodates the legitimate interest of employee privacy without unduly restricting the public employer’s opportunity to monitor and control the use of drugs by employees.”)
There were exceptions to this general rule for positions involving some unusually pressing public safety or security concerns, such as correctional officers in direct contact with dangerous prisoners, utility employees with access to vital areas of nuclear power plants, or narcotics officers with dangerous undercover assignments. But suspicionless testing was generally rejected for public employees with less unusual responsibilities, including ordinary police officers. Schulhofer, On the Fourth Amendment Rights of the Law-Abiding Public, 1989 Sup.Ct. Rev. 87, 129-130 (1990)(eiting cases).

C. The Majority’s Mistaken Reliance On Pre-Skinner “Special Needs” Dicta In Inapposite Non-Drug Test Cases

The Supreme Court did not actually establish and apply the “special needs” category permitting suspicionless urinalysis drug-testing of certain types of employees until 1989 in Skinner and Von Raab. Previously, the Supreme Court Justices had spoken of “special needs” in dicta and in a separate opinion in a few cases that did not involve drug testing or a personal privacy invasion as serious as the compelled collection and analysis of a person’s urine. Moreover, the Supreme Court in those cases upheld the search or seizure as having been based upon a reasonable individualized suspicion.
In New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the Court found that a teacher’s report that a high school student had been smoking on school premises contrary to rules amounted to a reasonable suspicion that the student’s purse contained cigarettes. In O’Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), the Court found that charges of specific improprieties gave an employer the individualized suspicion of employment related sexual and other misconduct of Dr. Ortega to justify a search of his desk on government premises. In Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Court found that the tip received by a police officer that a probationer was storing guns in his apartment provided reasonable suspicion of wrongdoing.
The majority opinion’s attempt to characterize these cases as representing the establishment of expansible “special needs” categories prior to and unlimited by Skinner, Von Raab and Vemonia, is untenable. The majority’s reasoning is not only inconsistent with the Skinner trilogy, it is based entirely on dicta and it completely disregards the incongruous subject matter and holdings of those decisions as well as other statements contradictory to its thesis in the opinions. See Griffin, 483 U.S. at 876, 107 S.Ct. at 3169; O’Connor, 480 U.S. at 726, 107 S.Ct. at 1502; T.L.O., 469 U.S. at 342 & n. 8, 105 S.Ct. at 743 & n. 8.

D. The Currently Existing Law

The Supreme Court in its most recent urinalysis drug test case, reaffirmed that the Fourth Amendment requires the government to respect the right of people to be secure in their persons against unreasonable searches and seizures, and that to be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. Chandler v. Miller, — U.S. -, -, 117 S.Ct. 1295, 1298, 137 L.Ed.2d 513 (1997)(citing Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564, (1995)). However, in limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest *888 furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion. Chandler, — U.S. at -, 117 S.Ct. at 1298, (quoting Skinner, 489 U.S. at 624, 109 S.Ct. at 1417); see also Von Raab, 489 U.S. at 665-66, 109 S.Ct. at 1390-91.
The court clearly indicated that Skinner and Von Raab must be read in their unique contexts. Skinner concerned Federal Railroad Administration (FRA) regulations that required blood and urine tests of rail employees involved in train wrecks. The FRA adopted the drug-testing program in response to evidence of on the job drug and alcohol abuse by railroad train crews, the enormous safety hazard posed by such abuse, and the documented nexus between impaired employees and the incidence of train accidents. Factors tending to offset the privacy concerns were that the regulations reduced intrusiveness; the fact that the industry was regulated pervasively for safety diminished privacy expectations; the surpassing safety risks and interests; the illegal drug and alcohol use by rail employees could cause great human loss before signs of impairment were noticeable to supervisors; the program helped obtain invaluable information about major train wreck causes and; an individualized suspicion requirement in the chaotic aftermath of a train accident would impede detection of causation. See Chandler, — U.S. at -, 117 S.Ct. at 1301.
In Von Raab, drug interdiction had become the Customs Service’s primary enforcement mission; the covered posts directly involved drug interdiction or otherwise required Customs officers to carry firearms; the employees had access to vast sources of contraband; officers had been targets and some had succumbed to bribery; and it was not feasible to subject Customs Service employees to the kind of day to day scrutiny that is the norm in more traditional work environments. Chandler, — U.S. at -, 117 S.Ct. at 1301-02.
In Chandler the Supreme Court also pointed out the set of unique circumstances in Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), under which it had sustained a random sample drug-testing program for high school students engaged in inter-scholastic athletics, with written consent of each athlete’s parents, during the season of each sport: public school systems bear large responsibilities as “guardian and tutor” of children entrusted to their care; there was an “immediate crisis” caused by a sharp increase in drug use in the school district; student athletes were leaders of the drug culture; students within the school environment have a lesser expectation of privacy than members of the population generally; it is important to deter drug use by school children and to reduce the risk of injury caused by drug use among student athletes. Chandler, — U.S. at -, 117 S.Ct. at 1302.
According to the Chandler court, Skinner, Von Raab and Vemonia establish that the government’s “proffered special need for drug testing must be substantial — important enough to override the individual’s acknowledged privacy interest, sufficiently vital to suppress the Fourth amendment’s normal requirement of individualized suspicion.” Chandler, — U.S. at —, 117 S.Ct. at 1303. The Supreme Court in Chandler rejected the state’s invitation to apply a more deferential framework, stating that “[o]ur guides remain Skinner, Von Raab, and Vemonia.” Id. at -, 117 S.Ct. at 1302.
Before Chandler, it was already very clear that the present case does not fit into the Skinner-Von Raab-Vemonia “Special Needs” category. For the reasons previously discussed, the present case is clearly distinguishable from other cases allowing suspi-cionless searches or seizures in terms of the nature of the intrusion, the magnitude of risks to human lives and property, and/or the practicability of application of the reasonable individualized suspicion test. Chandler confirms, however, that, in the present case, the governmentally proffered special need for suspicionless drug testing has not been demonstrated to be real, substantial or sufficiently vital to suppress “the Fourth Amendment’s normal requirement of individualized suspicion[,]” Id. at -, -, 117 S.Ct. at 1300, 1303, when measured by “[o]ur guides *889 ... Skinner, Von Raab, and Vemonia." Id. at z-, 117 S.Ct. at 1303.
First, the state government in the present case has not established by legislated law or legislatively authorized government regulation any need, system or procedure for the suspicionless drug testing of physicians in hospital residency programs. In Skinner, Von Raab and Vemonia, the urinalysis tests were administered pursuant to well defined programs established by governmentally promulgated regulations or written policy statements based on documented needs, not by purely ad hoc decisions guided only by untrammeled supervisory discretion, as in the present case. In Vemonia, the drug testing was also authorized by the written consent of the parents of each student-athlete.
Second, there has been no demonstration here that public safety is genuinely in jeopardy or that there is a critical and immediate need to suppress the Fourth Amendment’s normal requirement of individualized suspicion.
Unlike the situation presented in Skinner, the record here indicates that neither the government nor the medical school had established a drug-testing program of any kind for resident physicians. Consequently, there were no regulations, guidelines or procedures established for drug testing. Moreover, pri- or to the state officer’s drug-test order, the medical school had undertaken no systematic study of drug abuse by residents. Consequently, the school had not established a documented link between drug abuse by residents and any medical accident. Further, the record does not reflect that residents participate in an industiy that is regulated pervasively to ensure safety; the practice of medicine, like that of law, is a profession, which is largely self-governed by its own ethical and disciplinary system. There was no indication of a surpassing safety interest in guarding against the risk that residents would cause loss of large numbers of human lives and millions of dollars of property damage due to drug use before any signs of impairment would become noticeable to supervisors. Of course, because there was no drug-testing program and no history of drug-related medical accidents in the residency program, it cannot be argued that any valuable medical data had been derived from urinalysis. There was no evidence that the individualized suspicion requirement for a drug test of resident physicians would seriously impede the employer’s ability to identify and eliminate or rehabilitate drug-impaired residents.
By the same token, the present case, in contrast with Von Raab, does not relate to the use of drug tests as a condition of promotion or transfer. Also, of course, it does not involve employees exposed to the vicissitudes of illicit drug smuggling and interdiction, firearm usage, exposure to narcotics sources, bribery, and blackmail.
Finally, the present case, which is quite distinguishable from Vemonia, involves free adult physicians working and training in a hospital resident program, not high school and junior high school student athletes to whom the public school system owed a duty as guardian and tutor to protect from moral corruption and physical injury due to drug use during an immediate crisis caused by a sharp increase in drug use in the school district.
In sum, under the current law, as under the clearly established law at the time of the state officer mandated drug test, the record in the present case is notably lacking in the presentation of a concrete danger demanding departure from the Fourth Amendment’s main rule that, to be reasonable under the Fourth Amendment, a search must be based on individualized suspicion. See Chandler, — U.S. at -, 117 S.Ct. at 1303.

Issues % and 8. The District Court Correctly Denied the State Officers’ Motions For Summary Judgment And Judgment As A Matter Of Law. The Officers Were Not Entitled To Qualified Immunity Because A Reasonable Officer Would Have Known The Drug-Test Order Was Unlawful Due To An Absence Of Reasonable Individualized Suspicion.

Under 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured *890 by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. Therefore, when a state officer acts under a state law in a manner violative of the Federal Constitution, he comes in conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. Scheuer v. Rhodes, 416 U.S. 232, 237, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) Although § 1983 on its face admits of no immunities, the Supreme Court has read it in harmony with general principles of tort immunities and defenses rather than in derogation of them. Imbler v. Pachtman, 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976) In the absence of congressional directions to the contrary, however, it is untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials. Malley v. Briggs, 475 U.S. 335, 340, n. 2, 106 S.Ct. 1092, 1095, n. 2, 89 L.Ed.2d 271 (1986); Butz v. Economou, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978); Harlow v. Fitzgerald, 457 U.S. 800, 818, n. 30, 102 S.Ct. 2727, 2738, n. 30, 73 L.Ed.2d 396 (1982).
The Supreme Court cases have generally provided government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. Anderson v. Creighton, 483 U.S. 635, 638-39, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987) (citing Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether an official protected by qualified immunity maybe held personally liable for an allegedly unlawful official action generally turns on the “objective legal reasonableness” of the action, assessed in light of the legal rules that were “clearly established” at the time it was taken. Anderson v. Creighton, 483 U.S. at 639, 107 S.Ct. at 3038 (quoting Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738-39).
Moreover, the right that the official is alleged to have violated must have been “clearly established” in a sufficiently particularized and relevant sense: “The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell, supra, 472 U.S., at 535, n. 12, 105 S.Ct., at 2820, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent. See, e.g., Malley, supra, 475 U.S., at 344-345, 106 S.Ct, at 1097-1098; Mitchell, supra, 472 U.S., at 528, 105 S.Ct., at 2816; Davis, supra, 468 U.S., at 191, 195, 104 S.Ct., at 3017, 3019.” Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. (emphasis added).
As demonstrated above, the clearly established law at the time the state officers ordered the physician resident-trainee to submit to an urinalysis drug test required that the officers have individualized reasonable suspicion that she had used illegal drugs and that evidence of such usage could be detected in her urine. Therefore, the contours of the physician-resident’s Fourth Amendment right were sufficiently clear that reasonable officials would understand that before ordering the collection and analysis of her urine, on pain of terminating her employment and residency training, they must have reasonable individualized suspicion, i.e., something more substantial than inarticulate hunches, that she had consumed drugs and that evidence of that usage could be detected by urinalysis.
Applying these principles, in the light of the pre-existing law a reasonable official would understand that ordering her to submit to urinalysis violated her right to privacy because the meager information available could not give rise to a reasonable individualized suspicion that her urine contained the evidence of illegal drug usage. The doctors on the scene when she slapped the unruly, *891 amphetamine-drugged patient immediately after he spat in her face did not think her reaction was drug induced or influenced. Approximately one month elapsed between this incident and the officers’ order that she submit to a monitored urinalysis test or be removed from the residency program. The record is devoid of any evidence even slightly suggesting drug usage by her between the slapping incident and the officers’ drug test ultimatum. Under all of the circumstances, the absence of any basis for reasonable individualized suspicion and the resulting unlawfulness of the officers’ drug test order were clearly apparent.
Issue A The Officers Failed To Preserve The Issue Of Insufficiency Of Evidence To Support A Punitive Damages Award For Our Review.
A post-verdict motion under Rule 50(b) for judgment as a matter of law cannot be made unless a previous motion for judgment as a matter of law was made by the moving party at the close of all the evidence. Rule 50(b); In re Owners of “Harvey Oil Center,” 788 F.2d 275, 278 (5th Cir.1986); Quinn v. Southwest Wood Products, Inc., 597 F.2d 1018, 1024 (5th Cir.1979). Because the defendants-appellants failed to move at the close of all the evidence for judgment as a matter of law on the issue of the sufficiency of evidence as to punitive damages, that issue has not been preserved for our review.