FILED

11/21/2019

Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 4, 2019 Session

**STATE OF TENNESSEE v. ANGELA CARRIE PAYTON HAMM
and DAVID LEE HAMM**

**Appeal by Permission from the Court of Criminal Appeals
Circuit Court for Obion County
No. CC-16-CR-15     Jeff Parham, Judge**

_____

**No. W2016-01282-SC-R11-CD**

_____

CORNELIA A. CLARK, J., dissenting.

I respectfully dissent from the majority's decision upholding the constitutionality of the warrantless and suspicionless search of Angela Payton Hamm's home. In so holding, the majority erroneously equates the privacy interests of probationers and parolees despite statements by the United States Supreme Court and this Court that probationers have greater expectations of privacy than parolees. Samson v. California, 547 U.S. 843, 850 (2006); State v. Stanfield, 554 S.W.3d 1, 10 (Tenn. 2018); State v. Turner, 297 S.W.3d 155, 162 (Tenn. 2009). I would hold that the state and federal constitutional safeguards against unreasonable searches and seizures require law enforcement officers to establish reasonable suspicion for a warrantless search of a probationer. Here, as the courts below concluded, the State failed to establish reasonable suspicion for the search. Accordingly, I would hold that the search violated the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution and affirm the Court of Criminal Appeals' judgment upholding the trial court's decisions granting the defendant's motion to suppress and dismissing the indictments.

## I. Constitutional Analysis

The Fourth Amendment to the United States Constitution[1] and article I, section 7 of the Tennessee Constitution[2] protect against unreasonable searches and seizures. State

_____

[1] U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").

v. Hawkins, 519 S.W.3d 1, 33 (Tenn. 2017). "[A]rticle I, section 7 is identical in intent and purpose with the Fourth Amendment." State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 423 S.W.2d 857, 860 (1968)). The hallmark protections of these constitutional provisions are the warrant requirement and the probable-cause requirement.[3] These requirements serve the "essential purpose[s]" of assuring citizens "that such intrusions are not the random or arbitrary acts of government agents[,] . . . that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope." Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. 602, 621-22 (1989) (citations omitted). These requirements "also provide[] the detached scrutiny of a neutral magistrate, and thus ensure[] an objective determination whether an intrusion is justified in any given case." Id. at 622 (citations omitted). Searches and seizures conducted pursuant to warrants are presumptively reasonable, but warrantless searches and seizures are presumptively unreasonable. Kentucky v. King, 563 U.S. 452, 459 (2011); State v. McCormick, 494 S.W.3d 673, 678-79 (Tenn. 2016).

Nevertheless, the ultimate touchstone of analysis under the Fourth Amendment and article I, section 7 is reasonableness, see King, 563 U.S. at 459; State v. Reynolds, 504 S.W.3d 283, 304 (Tenn. 2016), so exceptions to the warrant or the probable cause requirement have been recognized, and in certain limited circumstances, neither is required. Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989) ("[N]either a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance.").

In a number of cases, this Court and the United States Supreme Court have upheld the constitutionality of searches and seizures based on individualized suspicion that does not rise to the level of probable cause. See, e.g., Delaware v. Prouse, 440 U.S. 648, 654-55, (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 560 (1976); United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975); Terry v. Ohio, 392 U.S. 1, 21 (1968); State v. Hanning, 296 S.W.3d 44, 49 (Tenn. 2009). For example, warrantless, suspicionless searches designed to serve "special needs, beyond the normal need for law enforcement" have been upheld as reasonable under the Fourth Amendment and article I, section 7.

---

[2] Tenn. Const. art. I, § 7 ("[T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . .").

[3] See Kentucky v. King, 563 U.S. 452, 459 (2011) ("The text of the [Fourth] Amendment thus expressly imposes two requirements. First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."); see also Chandler v. Miller, 520 U.S. 305, 308 (1997) (stating that officials are generally barred "from undertaking a search or seizure absent individualized suspicion"); State v. Scarborough, 201 S.W.3d 607, 617 (Tenn. 2006) ("Under certain circumstances, searches conducted without a warrant but pursuant to individualized suspicion of criminal wrongdoing are also considered reasonable.")

See, e.g., City of Indianapolis v. Edmond, 531 U.S. 32, 37-40 (2000) (collecting cases approving suspicionless searches to serve special needs); Downey, 945 S.W.2d at 104 ("We, therefore, conclude that the use of a sobriety roadblock, although a seizure, can be a reasonable seizure under the Tennessee Constitution, provided it is established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene."). The United States Supreme Court relied on this special needs doctrine in the first case in which it addressed probationer searches. Griffin v. Wisconsin, 483 U.S. 868 (1987).

In Griffin v. Wisconsin, a Wisconsin regulation permitted probation officials to search a probationer's home when the officials had "'reasonable grounds' to believe [the residence contained] contraband—including any item that the probationer [could not] possess under the probation conditions." 483 U.S. at 870-71 (citing Wis. Admin. Code HSS §§ 328.21(4), 328.16(1) (1981)). The probation officials in Griffin received information from a police detective "that there were or might be guns in [Mr.] Griffin's apartment." Id. at 871. Two probation officers and three plainclothes policemen went to Mr. Griffin's apartment to conduct a search, but the probation officers alone searched Mr. Griffin's apartment under the authority of Wisconsin's probation regulation. Id. They discovered a handgun and charged Mr. Griffin with felony possession of a handgun. Id. at 872. He moved to suppress the evidence, but the trial court denied his motion, and the Wisconsin courts affirmed. Id.

The United States Supreme Court affirmed as well and upheld the constitutionality of the regulation authorizing the warrantless search based on "'reasonable grounds' (not probable cause)." Id. The Griffin Court explained:

> Although we usually require that a search be undertaken only pursuant to a warrant (and thus supported by probable cause, as the Constitution says warrants must be), we have permitted exceptions when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."

Id. at 873 (quoting New Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in judgment)) (citations omitted). The Griffin Court concluded that "[a] State's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements" of the Fourth Amendment. Id. at 873-74. In reaching this conclusion, the Griffin Court articulated and relied upon a continuum of privacy rights that has guided the Supreme Court's analysis in subsequent cases involving probationers and parolees. Specifically, the Griffin Court described probation as "simply one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-

- 3 -

security facility to a few hours of mandatory community service." Id. at 874. As a result, said the Supreme Court, probationers "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" Id. (alteration in original) (quoting Morrissey v. Brewer, 408 U.S. 471, 480 (1972)). Therefore, states are permitted "a degree of impingement upon privacy [during the course of such supervision] that would not be constitutional if applied to the public at large." Id. at 875. The Griffin Court held that strict enforcement of the Fourth Amendment's warrant requirement "would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires." Id. at 876. The Supreme Court commented that "even more than the requirement of a warrant, a probable-cause requirement would reduce the deterrent effect of the supervisory arrangement." Id. at 878. The Griffin Court concluded that it is "reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search . . . if the information provided indicates, as it did [in Griffin], only the likelihood ('had or might have guns') of facts justifying the search." Id. at 879-80.

The Griffin Court therefore upheld the warrantless search conducted pursuant to Wisconsin's constitutionally valid regulation, which required probation officials to have individualized suspicion, i.e. "reasonable cause" to believe that contraband was present. The Griffin Court therefore found it "unnecessary to consider whether . . . *any* search of a probationer's home by a probation officer is lawful when there are 'reasonable grounds' to believe contraband is present." Id. at 880. Nevertheless the Griffin Court emphasized that the "permissible degree" a state may impinge upon a probationer's expectation of privacy is "not unlimited." Id. at 875.

The Supreme Court revisited the subject of probationer searches in United States v. Knights when it considered whether law enforcement officers could constitutionality conduct a warrantless search of a probationer's home if the officers had reasonable suspicion to believe the probationer had engaged in criminal activity. 534 U.S. 112, 121 (2001). In Knights, the defendant, who was charged with committing various crimes while on probation, moved to suppress the State's evidence because it was seized by law enforcement officers in a warrantless search of his apartment that was supported by reasonable suspicion. Id. at 114-16. The Knights search was conducted pursuant to a condition of probation—not a regulation—that required the defendant to "'submit his . . . person, property, place of residence, vehicle, [and] personal effects, to [a] search at anytime, *with or without a search warrant, warrant of arrest[,] or reasonable cause* by any probation officer or law enforcement officer.'" Id. at 114 (emphasis added). The Knights Court declined to analyze the case according to the special needs doctrine it had used in Griffin. Id. at 117-18. Rather, the Knights Court evaluated the reasonableness of the search "under [its] general Fourth Amendment approach of 'examining the totality of

the circumstances,' with the probation search condition being a salient circumstance." Id. at 118 (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)). Under this approach, the Knights Court explained, "the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Id. at 118-19 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). Mr. Knights' "status as a probationer subject to a search condition inform[ed] both sides of that balance." Id. at 119.

In assessing the degree to which the search intruded upon Mr. Knights' privacy, the Supreme Court reiterated that "[p]robation is 'one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service.'" Id. (quoting Griffin, 483 U.S. at 874). Because the "probation order clearly expressed the search condition and [Mr.] Knights was unambiguously informed of it" the Supreme Court concluded that "[t]he probation condition . . . *significantly diminished* [Mr.] Knights' reasonable expectation of privacy." Id. at 119-20 (emphasis added) (footnote omitted).

Next the Knights Court considered "the governmental interest side of the balance," emphasizing the government's interest in reducing recidivism and noting that probationers are "'more likely than the ordinary citizen to violate the law.'" Id. at 120 (quoting Griffin, 483 U.S. at 880). The Knights Court also acknowledged the State's interests in rehabilitating and reintegrating probationers into society. Id. at 120-21.

After weighing the degree to which the search intruded upon Mr. Knights' significantly diminished privacy interest against the governmental interests in conducting the search, the Knights Court concluded that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." Id. at 121. The Knights Court explained:

> Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term "probable cause," a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable. Those interests warrant a lesser than probable-cause standard here. *When an officer has reasonable suspicion that a probationer* **subject to a search condition** *is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.*

The same circumstances that lead us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary.

Id. (emphasis added) (citations omitted). Importantly for purposes of this appeal, the Knights Court *both* reaffirmed the continuum of privacy rights that it had enunciated in Griffin *and* reiterated that a probationer subject to a search condition retains an expectation of privacy for purposes of constitutional analysis, although it is significantly diminished. Id. at 119-22. What the Knights Court did not decide is

whether the probation condition so diminished, or completely eliminated, [Mr.] Knights' reasonable expectation of privacy (or constituted consent) that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment. The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion.

Id. at 120 n.6 (citation omitted).

The United States Supreme Court still has not answered that question for probationers. But the Supreme Court has addressed "a variation of" that question in Samson v. California, a case involving parolees. 547 U.S. 843, 847 (2006). In a six-to-three decision, the Court in Samson upheld a California law requiring every prisoner released on parole to "'agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.'" Id. at 846 (quoting Cal. Penal Code Ann. § 3067(a) (West 2000)). The Samson Court discussed Griffin and Knights and reiterated that "parolees are on the 'continuum' of state-imposed punishments." Id. at 850 (quoting Knights, 534 U.S. at 119 (internal quotation marks omitted)). The Samson Court explained that "[o]n this continuum, *parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment*." Id. (emphasis added). After examining the conditions of parole in California, the Samson Court declared that "*parolees . . . have severely diminished expectations of privacy by virtue of their status alone*." Id. at 851-52 (emphasis added) (citations, quotation marks, and brackets omitted). The Samson Court next discussed the impact the parole search condition had on Mr. Samson's severely diminished expectation of privacy and contrasted it with the impact the probation search condition had on the probationer in Knights, stating:

the parole search condition under California law—requiring inmates who opt for parole to submit to suspicionless searches by a parole officer or other peace officer at any time,—was clearly expressed to petitioner. He signed an order submitting to the condition and thus was "unambiguously" aware of it. *In Knights, we found that acceptance of a clear and unambiguous search condition significantly diminished [Mr.] Knights' reasonable expectation of privacy. Examining the totality of the circumstances pertaining to petitioner's status as a parolee, an established variation on imprisonment, including the plain terms of the parole search condition, **we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate.***

Id. at 852 (emphases added) (citations, footnote, quotation marks, and brackets omitted). The Samson Court concluded then, that, unlike the probationer in Knights—who retained some expectation of privacy *despite* his status and acceptance of the search condition—the parolee in Samson—by virtue of his status and acceptance of the search condition—had no expectation of privacy. The Samson Court, which began its analysis by noting that it was addressing an issue left open in Knights, thus explicitly and plainly distinguished between the privacy interests of probationers and parolees. Id. at 846, 850-53.

The Samson Court drew fewer distinctions between the State's interests in supervising probationers and parolees, except to describe the State's interests in supervising parolees as "'overwhelming' . . . because 'parolees . . . are more likely to commit future criminal offenses.'" Id. at 853 (quoting Pa. Bd. of Prob. & Parole, 524 U.S. 357, 365 (1998)). The Samson Court confirmed "that a State's interests in reducing recidivism and . . . promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." Id. (citing Griffin, 483 U.S. at 879; Knights, 534 U.S. at 121). The Samson Court concluded that "[i]mposing a reasonable suspicion requirement . . . would give parolees greater opportunity to anticipate searches and conceal criminality." Id. at 855 (citing Knights, 534 U.S. at 120; Griffin, 483 U.S. at 879). After considering the State's interests and the parolee's lack of any legitimate expectation of privacy, the Samson Court held that "the Fourth Amendment does not prohibit a police officer from conducting a warrantless, suspicionless search of a parolee." Id. at 857.

In State v. Turner, a majority of this Court "adopt[ed] the reasoning of Samson and h[e]ld that the Tennessee Constitution permits a parolee to be searched without any reasonable or individualized suspicion where the parolee has agreed to warrantless searches by law enforcement officers." 297 S.W.3d at 166 (footnote omitted). We emphasized, however, that Samson is "a narrow exception to the usual rule." Id. at 164. Turner also expressly adopted the distinction Samson had drawn between the privacy

interests of probationers and parolees, stating: "On the continuum of possible punishments and reductions in freedoms, parolees occupy a place between incarcerated prisoners and probationers." Id. at 162. We opined that "parole status is . . . much more akin to incarceration than probation . . . in determining the reasonableness of a search." Id. at 166. In other words, we held that probationers have greater expectations of privacy than parolees. In the more recent State v. Stanfield decision, this Court reaffirmed Turner and its adoption of the Samson analysis and again quoted with approval the distinction Turner and Samson had drawn between the privacy interests of probationers and parolees. 554 S.W.3d at 10-11.

In upholding the warrantless and suspicionless search in this case, three of the justices in the Stanfield majority now abandon this distinction, equate the privacy interests of parolees and probationers, and uphold warrantless and suspicionless searches of probationers, citing "logic[]" and "public policy concerns" in support of its ruling. The majority is not alone in extending Samson to probationers, as courts in other jurisdictions have done so as well.[4] However, I remain convinced that the distinction drawn in Griffin, Knights, Samson, Turner, and Stanfield remains valid and that probationers retain greater expectations of privacy than parolees. Indeed, Tennessee statutes illustrate why this distinction is appropriate.

Under the Criminal Sentencing Reform Act of 1989 ("the 1989 Act"), trial judges are encouraged "to use alternatives to incarceration," Tenn. Code Ann. § 40-35-103(6) (2014), including probation, to promote effective rehabilitation, id. § 40-35-102(3)(C) (2014). But the 1989 Act reserves favorable consideration for alternative sentencing to offenders who have committed less serious crimes—especially mitigated and standard offenders who have been convicted of Class C, D, or E felonies—and for offenders who have less lengthy criminal histories. Tenn. Code Ann. § 40-35-102(6)(A) (2014). Only offenders who receive sentences of ten years or less are eligible for probation

---

[4] See, e.g., United States v. Williams, 650 F.App'x 977, 980 (11th Cir. 2016) (upholding the constitutionality of a suspicionless search of the home of a probationer subject to a warrantless search provision where the search was conducted primarily by probation officers); United States v. Tessier, 814 F.3d 432, 434-35 (6th Cir. 2016) (upholding a warrantless, suspicionless search of the residence of a Tennessee probationer who was subject to a warrantless search condition because the search served a legitimate law enforcement or probationary purpose); United States v. King, 736 F.3d 805, 810 (9th Cir. 2013) (concluding that "a suspicionless search, conducted pursuant to a suspicionless-search condition of a violent felon's probation agreement, does not violate the Fourth Amendment"); State v. Vanderkolk, 32 N.E.3d 775, 779 (Ind. 2015) (applying the holding in Samson to probationers and community corrections participants). Cf. State v. Adair, 383 P.3d 1132, 1135-38 (Ariz. 2016) (upholding as constitutionally valid a warrantless search of a probationer's home conducted by probation officers pursuant to valid probation conditions but declining to address whether law enforcement officers may constitutionally conduct a warrantless, suspicionless search as there was sufficient evidence in this case).

consideration. Id. § 40-35-303(a) (2018 Supp.). Persons convicted of certain offenses, such as vehicular homicide by driving while intoxicated, aggravated kidnapping, aggravated robbery, aggravated sexual battery, statutory rape by an authority figure, aggravated child abuse and neglect, certain drug offenses, and certain sexual exploitation offenses, are not eligible for probation. Id.

Even if an offender satisfies the criteria for favorable consideration for alternative sentencing and eligibility for probation, trial judges retain discretion to deny probation entirely or to impose a sentence of full or partial confinement for other reasons, including if the trial judge determines that (1) "[c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;" (2) "[c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide effective deterrence to others likely to commit similar offenses;" or (3) "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant." Tenn. Code Ann. § 40-35-103(1) (2014). If a trial court "determines that a period of probation is appropriate, the court shall sentence the defendant to a specific sentence but shall suspend the execution of all or part of the sentence and place the defendant on supervised or unsupervised probation either immediately or after a period of confinement for a period of time no less than the minimum sentence allowed under the classification and up to and including the statutory maximum time for the class of the conviction offense." Id. § 40-35-303(c)(1) (2014). Trial courts may also impose probation for misdemeanor offenses, and in certain limited circumstances, may sentence misdemeanor offenders to up to two years on probation. Id. § 40-35-303(c)(2).

These Tennessee statutes are designed to give trial courts wide discretion in imposing probation as a sentence and afford trial courts plenty of discretion to deny probation, should the trial court determine that releasing an offender will pose too many risks to the public. No Tennessee statute suggests that the General Assembly believes warrantless, suspicionless searches are required to advance the State's interests in supervising probationers. For example, there is no Tennessee law, like the California law at issue in Samson, requiring courts to condition probation on a probationer's willingness to accept a warrantless, suspicionless search condition. Rather, Tennessee statutes are designed to ensure that probation is reserved for offenders who commit less serious offenses, who have minimal criminal histories, and who pose the least recidivism risk and the least risk of danger to the public. Tennessee statutes give trial courts the discretion needed to determine which offenders should be incarcerated and which offenders should be probated.

On the other hand, parolees, by definition, are offenders that have been ordered to serve their sentences in confinement. Tenn. Code Ann. § 40-35-501(a)(1) (2014) ("An inmate shall not be eligible for parole until reaching the inmate's release eligibility date .

. . .”); id. § 40-35-501(a)(2) (“[O]nly inmates with felony sentences of more than two (2) years or consecutive felony sentences equaling a term greater than two (2) years shall be eligible for parole consideration.”).  This fact alone is significant because, under the 1989 Act, “first priority regarding sentencing involving incarceration” is given to *convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation.”*  Tenn. Code Ann. § 40-35-102(5) (emphasis added).  These Tennessee statutes illustrate that parolees are, by definition, closer on the continuum to incarceration than probationers.   Parolees have committed more severe criminal offenses than probationers, have more lengthy criminal records than probationers, and have failed at past efforts of rehabilitation.

These statutory differences between probationers and parolees fully warrant the distinction that the United States Supreme Court and this Court have drawn between the privacy interests of probationers and parolees.   Therefore, I would reaffirm our prior decisions distinguishing between the expectations of privacy of probationers and parolees.  I would hold, as some courts in other jurisdictions have held, that searches of probationers must be based on reasonable suspicion.[5]

This holding would be consistent with the <u>Samson</u> Court’s express recognition that probationers retain greater expectations of privacy than parolees.  It also would recognize that the United States Supreme Court has never approved as constitutionally permissible warrantless and suspicionless searches of probationers.  In <u>Griffin</u> and in <u>Knights</u>, some level of individualized suspicion supported the searches.  In <u>Griffin</u>, the Supreme Court approved a regulation that permitted warrantless searches based on “reasonable grounds” to believe that contraband was present, 483 U.S. at 871, and in <u>Knights</u>, the Supreme Court upheld a warrantless search that was supported by reasonable suspicion, 534 U.S. at 121-22.  This Court certainly is free to interpret the

---

[5] <u>See, e.g.</u>, <u>State v. Bennett</u>, 288 Kan. 86, 200 P.3d 455, 463 (Kan. 2009) (holding that a probationer may not be searched by a probation or law enforcement officer absent reasonable suspicion and that a condition imposed by the trial court subjecting the probationer to random, suspicionless searches was unconstitutional); <u>State v. Cornell</u>, 146 A.3d 895, 909 (Vt. 2016) (declining to extend <u>Sampson</u> to searches of probationers and holding that “reasonable suspicion for search and seizure imposed on probationers is required by the Fourth Amendment”); <u>see also</u> <u>State v. Ballard</u>, 874 N.W.2d 61, 62 (N.D. 2016) (concluding that the suspicionless search of the home of an unsupervised probationer subject to a warrantless search condition was unreasonable under the Fourth Amendment); <u>Murry v. Commonwealth</u>, 762 S.E.2d 573, 581 (Va. 2014) (concluding that a probation condition subjecting a probationer to a warrantless, suspicionless search by any probation or law enforcement officer at any time was not reasonable in light to the probationer’s background, his offenses, and the surrounding circumstances).

Tennessee Constitution as affording greater protection than the United States Constitution, Doe v. Norris, 751 S.W.2d 834, 838 (Tenn. 1988).  On the other hand,

> [w]e are bound by the interpretation given to the United States Constitution by the Supreme Court of the United States. This is fundamental to our system of federalism.  The full, final, and authoritative responsibility for the interpretation of the federal constitution rests upon the Supreme Court of the United States. This is what the Supremacy Clause means.

Miller v. State, 584 S.W.2d 758, 760 (Tenn. 1979), overruled on other grounds by State v. Pruitt, 510 S.W.3d 398 (Tenn. 2016).

Therefore, the United States Constitution, as interpreted by the United States Supreme Court, establishes the minimal, "floor . . . of constitutional protection" to which all citizens are entitled.  Kreimer v. Bureau of Police, 958 F.2d 1242, 1269 (3d Cir. 1992).  I fear that the majority in this case has opened a trap door in the floor of minimal protection, without any sound legal basis for doing so, by approving warrantless and suspicionless searches of probationers when the United States Supreme Court has never done so and has expressly distinguished between probationers and parolees.

Here, as in Knights, the warrantless, suspicionless search occurred in the probationer's home where her expectation of privacy was at its most robust.  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995) ("What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." (citation omitted)).  The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972); see also Silverman v. United States, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion.").  Therefore, I would require the State to establish that the search was based on reasonable suspicion of the probationer's criminal activity.  Knights, 534 U.S. at 121-22 (upholding a search based on "reasonable suspicion that [the probationer] . . . is engaged in criminal activity" (citations omitted)).  This lesser standard of individualized suspicion is not overly burdensome, and it strikes the appropriate balance between the State's legitimate interests in rehabilitation, prevention of recidivism, and reintegration into society, and the probationer's significantly diminished, but not extinguished, expectation of privacy.

The reasonable suspicion standard would provide some guidance for and restraint upon the discretion law enforcement officers exercise in probationer searches.  Requiring reasonable suspicion for probationer searches also would lessen, and perhaps even eliminate, the risk of repeated, disruptive, and potentially harassing searches of

probationers at their homes, schools, places of employment, or other public places. Indeed, authorizing warrantless, suspicionless searches actually may impede the State's legitimate goals of rehabilitation and reintegration. State v. Hamm, No. W2016-01282-CCA-R3-CD, 2017 WL 3447914, at *13 (Tenn. Crim. App. Aug. 11, 2017) (Williams, J., concurring). Such searches call attention to a probationer's criminal conduct and have the potential to stigmatize probationers. Many probationers will have little recourse should warrantless, suspicionless searches become repetitive or harassing. As Judge John Everett Williams explained in his separate opinion in the Court of Criminal Appeals:

> While such intimidating and harassing searches might be challengeable in a motion to suppress if officers happen to discover evidence of illegal activity, a probationer who is following the law and the conditions of probation but nevertheless continues to be subject to intimidating and harassing searches has little recourse.
>
> A suspicionless search of a probationer at . . . her place of employment runs the risk of disrupting the business and could subject the employer and other employees to a search that would not otherwise be constitutionally permissible. As a result, an employer has less of an incentive to hire a probationer subject to this condition.

Hamm, 2017 WL 3447914, at *13-14 (Williams, J., concurring).

Warrantless, suspicionless searches also may hamper rehabilitation by making it difficult for probationers to find housing. Anyone sharing a residence with a probationer loses a portion of his or her own constitutional protections because areas of the residence over which the probationer exercises common authority also will be subject to warrantless, suspicionless searches under the common authority doctrine. Id. In addition, searches often are not confined to common areas. As Judge Williams noted, the officers in this case did not limit their search to areas over which Angela Payton Hamm exercised common authority but searched every room of the residence except one. Id.

Another troubling aspect is that the majority's decision cannot logically be limited to supervised probationers who have been convicted of felony offenses, like Angela Payton Hamm, although the majority purports to do so by including a single footnote. The decision discusses "probationers" broadly and provides no basis for distinguishing between felons on supervised probation and persons serving sentences on community corrections or unsupervised probationers. Although the majority by that same footnote also purports to exempt from its analysis misdemeanants placed on probation, the majority again offers no reasoned basis for this exemption. The basis for such an exemption certainly is not apparent from the majority's analysis. For example, if the severity of an offense could serve as a reason for distinguishing between felony and

- 12 -

misdemeanor probationers, why would it not also serve as a basis for distinguishing between parolees and probationers? While the full breadth of the majority's decision allowing warrantless, suspicionless searches remains to be seen, it clearly encompasses 57,832 probationers that the Tennessee Department of Correction reported supervising as of June 30, 2018. Tenn. Dep't of Corr., Annual Report 6 (2018) (available at https://www.tn.gov/content/dam/tn/correction/documents/AnnualReport2018.pdf).[6] This number rises to 65,541 Tennesseans if the majority's decision extends to persons serving sentences on community corrections. Id.

The majority's ruling and the rulings of courts in other jurisdictions upholding the constitutionality of such warrantless, suspicionless searches of probationers constitute a serious erosion of the Fourth Amendment's protection against unreasonable searches and seizures. "The historical record demonstrates that the framers believed that individualized suspicion was an inherent quality of reasonable searches and seizures." Thomas K. Clancy, The Role of Individualized Suspicion in Assessing the Reasonableness of Searches & Seizures, 25 U. Mem. L. Rev. 483, 489 (1995). The United States Supreme Court should grant review on this issue and restore this core Fourth Amendment protection for probationers by holding that warrantless searches of probationers are constitutionally permissible only if based upon reasonable suspicion of a probationer's involvement in criminal activity. Until the United States Supreme Court acts, however, the Tennessee General Assembly should restore this minimal protection by enacting a statute that requires law enforcement officials to establish reasonable suspicion for warrantless searches of probationers. E.g., Kan. Stat. Ann. § 21-6607(c)(5) (West 2011) (requiring that searches of probationers by law enforcement and probation officials be "based on reasonable suspicion" of probation violations or criminal activity). As already explained herein, a statute imposing this minimal individualized suspicion requirement would advance the State's interests in rehabilitation and reintegration.

## II. Reasonable Suspicion Was Not Established

Here, the trial court found that the State had failed to establish that the search of Angela Payton Hamm's home was supported by reasonable suspicion. A trial court's findings of fact in a suppression hearing are upheld on appeal unless the evidence preponderates against those findings. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "The credibility of witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge." State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013) (citing Odom, 928 S.W.2d at 23). The evidence does not preponderate against the trial court's findings.

---

[6] There are over five times more probationers (57,832) in Tennessee than parolees (11,163). Tenn. Dep't of Corr., Annual Report 6 (2018) (available at https://www.tn.gov/content/ dam/tn/correction/documents/AnnualReport2018.pdf).

Courts consider the totality of the circumstances when determining whether specific and articulable facts establish reasonable suspicion. State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992) (citing United States v. Cortez, 449 U.S. 411, 417 (1981)). The relevant non-exclusive circumstances are "[the officer's] objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." Id. (citing Cortez, 449 U.S. at 418). "A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Id. (citing Terry, 392 U.S. at 21). But, reasonable suspicion must be based on something more than an officer's "inchoate and unparticularized suspicion or 'hunch.'" Hanning, 296 S.W.3d at 49 (quoting Terry, 392 U.S. at 27). The officers here had only second hand non-specific information, and only one statement from an unidentified informant who had friends that claimed to have purchased methamphetamine from the defendants.

In particular, Deputy James Hall of the Obion County Sheriff's Office received information from a female, Lindsey Gream, when he served her with an arrest warrant arising from an incident in Dyer County. After thanking him "for taking her to the hospital and keeping her alive," she told Deputy Hall "there [were] some heavy players in Obion County that [law enforcement officers] needed to watch." When Deputy Hall asked her to identify them, she refused "to say specifically who exactly," but told him that they were located in "Glass."[7] When Officer Hall said "David Hamm," Ms. Gream "looked at [him], nodded her head, and smiled." Ms. Gream told Deputy Hall that "they" had been trafficking ice methamphetamine to Obion County and "making trips frequently across the river." She gave no indication of how she knew of these illegal activities but indicated that she believed "they" had "re-upped that day, [or] a couple of days prior . . . which mean[t] receiving, buy[ing] more methamphetamine or narcotics." Deputy Hall used the pronoun "they" in his testimony but identified David Hamm as the only person Ms. Gream identified. If he had information implicating Angela Payton Hamm in any illegal activities, Deputy Hall did not discuss it in his testimony.

Officer Ben Yates of the Union City Police Department provided the only testimony about information implicating Angela Payton Hamm in illegal activity. Officer Yates said that he received information from "a reliable informant" one day before the warrantless, suspicionless search at issue here. This reliable informant told Officer Yates "that David Hamm and Angela Payton were 'doing it big in Glass.'"[8] According to Officer Yates, this informant "had been involved in numerous narcotic cases, the seizure

---

[7] In footnote five of its brief to this Court, the State appears to interpret Glass as a common street name for methamphetamine, but the record belies this interpretation and indicates that, as used in this case, the word refers to a location not a drug.

[8] In the transcript on appeal, quotation marks that apparently were intended to indicate the statement the informant made to Officer Yates appear only around the words "doing it big in Glass."

of narcotics, made numerous cases for the drug task force" but had not personally observed David Hamm or Angela Payton Hamm involved in illegal drug activities or transactions and had never personally been inside the residence that was searched. The informant's secondhand information came from the informant's "friends [who] purchase[d] methamphetamine."

Officer Yates did not interview the informant's friends or corroborate by any other means the informant's information. Officer Yates acknowledged that another informant "who was cooperating with the drug task force" went to the residence that was searched and attempted to purchase methamphetamine from Clifton Hamm, who also lived there, but was unable to do so. Officer Yates did not explain why the controlled drug buy failed. The State has also suggested that Clifford Hamm's suspicious conduct concerning the security cameras also established reasonable suspicion. But Angela Payton Hamm was not on the property when this conduct occurred, and it bore no connection to her. In short, the record overwhelmingly supports the trial court's finding that the officers lacked specific and articulable facts necessary to establish reasonable suspicion that Angela Hamm was engaged in criminal activity.

### III. Consent

In the Court of Criminal Appeals, the State also sought to justify the search by arguing that Angela Payton Hamm consented to warrantless, suspicionless searches when she accepted the probation search condition. See Hamm, 2017 WL 3447914, at *16 (Williams, J., concurring) (discussing consent). The State has not raised that issue in this Court, and for good reason, because the record wholly belies the assertion. The unrefuted proof in the record establishes that the probation search condition Angela Payton Hamm accepted should be understood as waiving only the warrant and probable cause requirements and requiring reasonable suspicion. The search condition stated: "I agree to a search, without warrant, of my person, vehicle, property, or place of residence by any Probation/Parole Officer or law enforcement officer, at any time." Deputy Hall testified that this search condition required the officers to have reasonable suspicion for any search. Deputy Hall was asked: "Why did you think you needed reasonable suspicion, when [Angela Payton Hamm's probation] document says nothing about it?" He responded: "Some documents of State probation or parole are somewhat similar, somewhat different. *On some documents it actually has in there without reasonable suspicion. This document, however, does not say without reasonable suspicion. That's why I established reasonable suspicion prior to the search.*" (Emphasis added.) Therefore, even assuming a probationer's acceptance of a probation search condition may, in some circumstances, be deemed consent to suspicionless searches, the unrefuted proof establishes that this is not one of those circumstances and that Angela Payton Hamm did not consent to suspicionless searches by her acceptance of the probation search condition here.

Finally, in light of Deputy Hall's unrefuted testimony that the probation search condition obligated the State to establish reasonable suspicion for any search, the majority could have avoided deciding whether warrantless, suspicionless probationer searches are constitutionally permissible and resolved this appeal by deciding whether this search was supported by reasonable suspicion. See Keough v. State, 356 S.W.3d 366, 371 (Tenn. 2011) ("This Court decides constitutional issues only when absolutely necessary for determination of the case and the rights of the parties. Where an appeal can be resolved on non-constitutional grounds, we avoid deciding constitutional issues." (citations omitted)). The majority has instead chosen to resolve the constitutional issue and approve warrantless, suspicionless searches of probationers. Therefore, I am constrained to respectfully dissent from the majority's decision.

_____

CORNELIA A. CLARK, JUSTICE